**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| LAWRENCE H. GRESS, on behalf of himself and others similarly situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) Case No.: |
| SAFESPEED, LLC, an Illinois limited liability company; NIKKI ZOLLAR; CHRIS LAI; KHALID ("CLIFF") MAANI; OMAR MAANI; TONY RAGUCCI; MARTIN A. SANDOVAL; CITY OF OAKBROOK TERRACE; PATRICK DOHERTY; BILL HELM; JEFF TOBOLSKI; ROBERT GEDVILLE; JOHN O'SULLIVAN; SERGIO RODRIGUEZ; JOHN RYAN; MICHAEL CARBERRY; JOHN KOSMOWSKI; and BILL MUNDY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

_____

## CLASS ACTION COMPLAINT

Plaintiff, LAWRENCE H. GRESS ("Gress"), by and through his attorneys, KENT

MAYNARD & ASSOCIATES LLC, for himself and as a representative of the Plaintiff Class

described below, states as follows:

## NATURE OF THE ACTION

1.      Beginning no later than 2016 and continuing to the present, SAFESPEED, LLC.

("SafeSpeed"), along with its members and undisclosed sales agents ("Consultants"), created and

conducted, in collaboration with various public officials and municipalities, a racketeering

conspiracy that corruptly used red-light cameras ("RLCs" or "Red-Light Cameras") to create a

"money machine" that would automatically generate millions of dollars in revenue for the

Defendants and thereafter used bribes to protect the money machine from calls for legislation to

ban RLCs as well as, in at least one instance, objections of the Illinois Department of Transportation ("IDOT").

2.       In or around 2016, former Illinois State Senator Martin A. Sandoval ("Sandoval") asked SafeSpeed for $20,000 in annual campaign contributions in return for Sandoval's support for SafeSpeed and its business interests in the General Assembly. SafeSpeed agreed and subsequently made, with the knowledge and acquiescence of SafeSpeed's President, Nikki Zollar, $20,000 in annual campaign contributions to Sandoval from SafeSpeed and other entities so as to conceal the fact that SafeSpeed was making the annual contributions to Sandoval.

3.       No later than 2016, in exchange for these and other secret campaign contributions and bribes from SafeSpeed, Sandoval corruptly used his position as Chairman of the Senate's Transportation Committee and its Red-Light Camera Subcommittee i) summarily to kill a series of bills that would have banned RLCs by repealing Illinois State Law, HB4835, now codified at 625 ILCS 5/11-208.6 (hereinafter "Section 11-208"); and ii) corruptly to override objections of the Illinois Department of Transportation ("IDOT") to RLCs that SafeSpeed wished to install.

4.       In return for his services as SafeSpeed's "Protector" in the Illinois Senate, Sandoval accepted at least $70,000 in bribes from SafeSpeed.

5.       Plaintiff brings this action against Defendants, individually and on behalf of a Class, for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, in particular, §§ 1962(c), (d); and 1964, which violations were committed by perpetrating a scheme through an enterprise specifically designed to defraud Plaintiff and the Class out of millions of dollars in fines issued by RLCs that were corruptly and wrongfully installed and maintained as a direct and proximate result of bribes paid to public officials.

6.   The Plaintiff Class consists of persons who received traffic tickets generated by RLCs installed and maintained in operation because of bribes paid to public officials, including, without limitation, bribes paid to Sandoval and Tony Ragucci, the Mayor of Oakbrook Terrace.

7.   The relief sought herein is the cancellation as "void" of tickets issued by RLCs corruptly installed and maintained by SafeSpeed and the disgorgement and reimbursement by Defendants of all proceeds they received from the RLCs that SafeSpeed corruptly installed and maintained in operation as a remedy for the damages caused by Defendants' violations of 18 U.S.C. §§ 1962(c) and (d) and 1964.

8.   Defendants have violated 18 U.S.C. §§ 1962(c) and (d) and 1964 by actively participating in the association-in-fact enterprise conducted by Defendants to recruit and corrupt with bribes public officials, including Sandoval, who agreed to act as SafeSpeed's "Protector" against unfavorable legislation in the General Assembly and to help SafeSpeed override objections from IDOT as to placement of RLCs desired by SafeSpeed.

## JURISDICTION AND VENUE

9.   The subject matter jurisdiction of this Court is conferred and invoked pursuant to 28 § 1331, and the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 §1961 et seq. (specifically 18 U.S.C. § 1964(c)).

10.   This Court also has jurisdiction over this action as a class action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), providing for jurisdiction where, as here, "any member of a class of plaintiffs is a citizen of a State different from any defendant," and the aggregated amount in controversy exceeds five million dollars ($5,000,000), exclusive of interests and costs. See 28 U.S.C. §§ 1332(d)(2) and (6).

11.     Venue is proper in this judicial district under 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(a), (b), and (c) because a substantial part of the events and omissions giving rise to this action occurred in the Northern District of Illinois and because Defendants transact business in this district.

## PARTIES

12.     Plaintiff LAWRENCE H. GRESS is a natural person who was, at times relevant hereto, a citizen of Illinois.

13.     Plaintiff Gress and the Class Members are persons who received traffic tickets issued with data collected by corruptly installed and corruptly maintained RLCs, RLCs that owe their existence to bribes paid to public officials.

14.     Defendant SAFESPEED, LLC is an Illinois Limited Liability Company authorized to do business and doing business in the Northern District.

15.     Defendant NIKKI ZOLLAR is a co-founder, stakeholder, President, and Chief Executive Officer of SafeSpeed.

16.     Defendant CHRIS LAI is a citizen of the State of Illinois and a co-founder and Chief Operating Officer of SafeSpeed.

17.     Defendant KHALID ("CLIFF") MAANI is a citizen of the State of Illinois and a founding member, investor, and stakeholder in SafeSpeed.

18.     Defendant OMAR MAANI is a citizen of the State of Illinois and a founding member, investor and stakeholder in SafeSpeed, and the son of Khalid Maani.

19.     Defendant TONY RAGUCCI is a citizen of the State of Illinois and the Mayor of the CITY OF OAKBROOK TERRACE, which contracted with SafeSpeed for the placement of RLCs.

20.     Defendant MARTIN A. SANDOVAL is a citizen of the State of Illinois who was, for 17 years before January 1, 2020, a state Senator in the Illinois General Assembly and, in January 2009, become Chairman of the Senate Transportation Committee and its Subcommittee on Red Light Cameras, respectively, and served in that capacity until October 11, 2019.

21.     Defendant, CITY OF OAKBROOK TERRACE, is an Illinois municipality that contracted with SafeSpeed for the deployment of RLCs, including, in 2017, RLCs at the intersection of Route 83 and 22nd Street in Oakbrook Terrace ("the Intersection"), over repeated objections from IDOT and the neighboring Village of Oak Brook.

22.     Defendant PATRICK DOHERTY is a citizen of the State of Illinois and the chief of staff for Jeff Tobolski, a Cook County Commissioner and the Village President of McCook, Illinois.

23.     Defendant BILL HELM is a citizen of the State of Illinois and a former City of Chicago Deputy Aviation Commissioner.

24.     Defendant JEFF TOBOLSKI is a citizen of the State of Illinois and has been the Village President of McCook, since 2007, and a Cook County Commissioner since 2010.

25.     Defendant ROBERT GEDVILLE is a citizen of the State of Illinois and a former Police Chief of the Village of Justice, Illinois.

26.     Defendant JOHN O'SULLIVAN is a citizen of the State of Illinois, and a Worth Township Supervisor and Democratic committeeman.

27.     Defendant SERGIO RODRIGUEZ is a citizen of the State of Illinois and the Mayor of Summit, Illinois.

28.     Defendant JOHN RYAN is an individual citizen of Illinois and the Mayor of Alsip, Illinois.

29.     Defendant MICHAEL CARBERRY is a citizen of the State of Illinois and a former State Representative who previously served on the Oak Lawn Village Board.

30.     Defendant JOHN KOSMOWSKI is a citizen of the State of Illinois and the Police Chief of Summit, Illinois.

31.     Defendant BILL MUNDY is a citizen of the State of Illinois and the Head of Public Works of Summit, Illinois.

32.     Various other persons, firms, organizations, corporations and business entities, some unknown and others known, have participated as co-conspirators in the violations and conduct alleged herein and performed acts in furtherance of the conspiracy described herein.

## THE RICO ENTERPRISE

33.     The RICO Enterprise is an association-in-fact of SafeSpeed executives, employees, and undisclosed sales agents ("Consultants") as well as current and former public officials in the General Assembly and various municipalities.

34.     Defendants and their above-named co-conspirators conducted or actively participated in the conduct of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). Alternatively, Defendants, co-conspirators, and Enterprise participants identified herein, through an agreement to commit two or more predicate acts, conspired to conduct or participate in the conduct of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d). The actions of Defendants, co-conspirators, and Enterprise participants were in furtherance of the Enterprise and in violation of 18 U.S.C. § 1962(d).

35.     The Enterprise is distinct from, albeit conducted by SafeSpeed, through its members and the other Defendants, and has an ongoing existence.

36.     More Specifically, participants in the Enterprise include:

a.   NIKKI ZOLLAR in her capacity as a co-founder, stakeholder, President, and Chief Executive Officer of SafeSpeed, participated in the scheme by causing SafeSpeed secretly to hire public officials as commissioned, undisclosed sales agents ("Consultants") whose compensation was calculated as a percentage of monthly income from RLC fines collected from RLCs they helped to place; by funding bribes paid to Sandoval and other public officials in a position to influence or approve the installation of SafeSpeed RLCs and to prevent adverse actions in the Illinois General Assembly or IDOT; and by concealing such bribes from the General Assembly and the citizens of the State of Illinois so as to defraud Plaintiffs and the Class and causing damage to their business and property by facilitating the corrupt installation and operation of RLCs in several Illinois municipalities, including, without limitation, the Defendant City of Oakbrook Terrace, pursuant to various contracts and agreements.

b.   CHRIS LAI, is a co-founder, stakeholder, and Chief Executive Officer of SafeSpeed who participated in the scheme by causing SafeSpeed secretly to hire public officials as commissioned, undisclosed sales agents ("Consultants") whose compensation was calculated as a percentage of monthly income from RLC fines collected from RLCs they helped to place; by funding bribes paid to Sandoval and other public officials in a position to influence or approve the installation of SafeSpeed RLCs and to prevent adverse actions in the Illinois General Assembly or IDOT; and by concealing such bribes from the General Assembly and the citizens of the State of Illinois so as to defraud Plaintiffs and the Class and causing damage to their business and property by facilitating the corrupt installation and operation of RLCs in several Illinois municipalities, including, without limitation, the Defendant City of Oakbrook Terrace, pursuant to various contracts and agreements.

c.   KHALID ("CLIFF") MAANI is a founding member, investor, and stakeholder in SafeSpeed who participated in the scheme by causing

SafeSpeed secretly to hire public officials as commissioned, undisclosed sales agents ("Consultants") whose compensation was calculated as a percentage of monthly income from RLC fines collected from RLCs they helped to place; by funding bribes paid to Sandoval and other public officials in a position to influence or approve the installation of SafeSpeed RLCs and to prevent adverse actions in the Illinois General Assembly or IDOT; and by concealing such bribes from the General Assembly and the citizens of the State of Illinois so as to defraud Plaintiffs and the Class and causing damage to their business and property by facilitating the corrupt installation and operation of RLCs in several Illinois municipalities, including, without limitation, the Defendant City of Oakbrook Terrace, pursuant to various contracts and agreements.

d.    OMAR MAANI is a founding member, investor and stakeholder in SafeSpeed, the son of Khalid Maani, and the person referred to as "CW-1" in the Plea Agreement present to the Court by Sandoval on January 28, 2020, who, in his capacity as a founding member, investor, and stakeholder in SafeSpeed, participated in the scheme by causing SafeSpeed secretly to hire public officials as commissioned, undisclosed sales agents ("Consultants") whose compensation was calculated as a percentage of monthly income from RLC fines collected from RLCs they helped to place; by funding bribes paid to Sandoval and other public officials in a position to influence or approve the installation of SafeSpeed RLCs and to prevent adverse actions in the Illinois General Assembly or IDOT; and by concealing such bribes from the General Assembly and the citizens of the State of Illinois so as to defraud Plaintiffs and the Class and causing damage to their business and property by facilitating the corrupt installation and operation of RLCs in several Illinois municipalities, including, without limitation, the Defendant City of Oakbrook Terrace, pursuant to various contracts and agreements

e.    TONY RAGUCCI ("Ragucci") is or was the Mayor of the CITY OF OAKBROOK TERRACE, who participated in the scheme by receiving bribes from SafeSpeed to induce the municipality corruptly to contract with SafeSpeed for the placement of RLCs at the Intersection, over repeated objections from IDOT and neighboring Oak Brook, and in one other location in Oakbrook Terrace.

f.     MARTIN A. SANDOVAL is a citizen of the State of Illinois and was, for 17 years before January 1, 2020, a state Senator in the Illinois General Assembly who, in January 2009, become Chairman of the Senate Transportation Committee and its Subcommittee on Red Light Cameras, respectively, and served in that capacity until October 11, 2019. Sandoval participated in the scheme by using his position as Chairman of the Senate Transportation Committee and its Subcommittee on Red Light Cameras to solicit bribes from SafeSpeed and its principals in exchange for "protection" against unfavorable actions in the General Assembly and by IDOT in respect of applications to install RLCs in specific locations. As compensation for that role, Sandoval requested and received annual "campaign contributions" of $20,000 from SafeSpeed and later requested to be paid $5,000 per month, in lieu of a specified percentage of the monthly income from RLC fines collected from SafeSpeed RLCs. Sandoval thereby deprived the citizens of Illinois of his honest services and sought to conceal the SafeSpeed bribes from the General Assembly and the citizens of the State of Illinois so as to defraud Plaintiffs and the Class and causing damage to their business and property by facilitating the corrupt installation and operation of RLCs in several Illinois municipalities, including, without limitation, the Defendant City of Oakbrook Terrace, pursuant to various contracts and agreements

g.    CITY OF OAKBROOK TERRACE is an Illinois municipality that, at the behest of Tony Ragucci, rejected multiple recommendations from the Illinois Department of Transportation ("IDOT") in order to contract with

-9-

SafeSpeed for the deployment, in 2017, of RLCs at the Intersection Route 83 and 22nd Street in Oakbrook Terrace, and thereafter began to assess fees against vehicle owners, including the named Plaintiff, for RLC violations allegedly captured by SafeSpeed RLCs at the Intersection.

h.  <u>PATRICK DOHERTY</u> is the chief of staff for Jeff Tobolski, a Cook County Commissioner and the Village President of McCook, Illinois, who participated in the scheme by moonlighting as an undisclosed sales "Consultant" for SafeSpeed and, in that capacity, received and continues to receive a "small percentage" from "every ticket that's paid" in certain communities that host SafeSpeed RLCs, placed in part thanks to his efforts.

i.  <u>BILL HELM</u> was a City of Chicago deputy aviation commissioner, overseeing airfield maintenance at O'Hare Airport at a salary of $125,000 a year from 2014 until he resigned in August 2019. Helm is a "political ally of Tobolski." While on the City payroll, Helm participated in the scheme by moonlighting as an undisclosed sales "Consultant" for SafeSpeed. In that capacity, Helm helped SafeSpeed contract with Matteson and Glendale Heights for the installation of RLCs and was compensated for assisting SafeSpeed to install RLCs in Matteson and Glendale Heights by receiving a share of the fines collected for RLC tickets issued there, pursuant to contracts with SafeSpeed. A 9/10/2019 email from SafeSpeed to Helm indicates that for July 2019, SafeSpeed owed Helm $4,156, calculated as 3.5% of $118,766 in "SafeSpeed fees" received by SafeSpeed that month from Matteson. The "fees" represent SafeSpeed's share of the fines collected from RLC tickets issued by SafeSpeed equipment in Matteson. Helm was interviewed on September 26, 2019, by federal agents who seized his cell phone. Helm violated City requirements that he disclose his "secondary employment" with SafeSpeed to the City and report his outside income from SafeSpeed to the Chicago Board of Ethics.

j.   JEFF TOBOLSKI has been the village president of McCook, since 2007, and a Cook County Commissioner since 2010. The FBI raided an office in Tobolski's home in September 2019 and seized $51,000.00 in cash from a safe located there. Tobolski reportedly has been regularly seen in the company of Omar Maani, a member of and stakeholder in SafeSpeed. Tobolski participated in the scheme by accepting bribes from SafeSpeed to induce McCook to contract with SafeSpeed for RLCs.

k.   ROBERT GEDVILLE is a former Police Chief of the Village of Justice, Illinois, who participated in the scheme by moonlighting as a sales "Consultant" for SafeSpeed until his termination in December 2012. Justice began issuing tickets from two SafeSpeed RLCs on September 1, 2012. While acting in his role as a sales agent for SafeSpeed, Gedville issued a mass-emailing to other public officials promoting SafeSpeed's RLCs and stating, "I recently have been afforded the opportunity to act as a consultant for SafeSpeed LLC. ... The village I serve is a client of SafeSpeed, and I am happy to promote their service." Gedville told a Deputy Police Chief that he - Gedville -- had had made a deal to sign up new municipalities for SafeSpeed in exchange for 1% of all revenue from towns Gedville signed up. Omar Maani helped Gedville incorporate a side business to hide Gedville's collection of money from SafeSpeed.

l.   JOHN O'SULLIVAN is a Worth Township Supervisor and Worth Township's Democratic committeeman who participated in the scheme by moonlighting as an undisclosed sales representative for SafeSpeed and, as such, promoted SafeSpeed's RLC services to public officials of Palos Heights and Crestwood, before Palos Heights and Crestwood contracted with SafeSpeed for the installation of RLCs. Previously, in September 2015, SafeSpeed RLCs began operating at two intersections in Oak Lawn. Soon thereafter, SafeSpeed began to pressure Oak Lawn officials to issue more tickets with data collected from SafeSpeed RLCs because more tickets would bring more revenue to Oak Lawn to SafeSpeed, and to

SafeSpeed's commissioned sales "consultants." Leading the push for more aggressive RLC ticketing in Oak Lawn were two former legislators from Oak Lawn, John O'Sullivan, and Michael Carberry.

m.  SERGIO RODRIGUEZ is the Mayor of Summit, Illinois, which was corruptly induced to install SafeSpeed RLCs.

n.  JOHN RYAN is the Mayor of Alsip, Illinois, which was corruptly induced to install SafeSpeed RLCs.

o.  MICHAEL CARBERRY is a former state Representative who previously served on the Oak Lawn Village Board and worked as an undisclosed sales "Consultant" for SafeSpeed. In that capacity, CARBERRY pressured Oak Lawn to increase the number of tickets issued with data collected from SafeSpeed RLCs in Oak Lawn in order to increase his share of income from such fines.

p.  JOHN KOSMOWSKI is a citizen of the State of Illinois and the Police Chief of Summit, Illinois, which was corruptly induced to install SafeSpeed RLCs.

q.  BILL MUNDY is a citizen of the State of Illinois and the Head of Public Works of Summit, Illinois, which was corruptly induced to install SafeSpeed RLCs.

37.  Various other persons, firms, organizations, corporations and business entities, some unknown and others known, have participated as co-conspirators in the violations and conduct alleged herein and performed acts in furtherance of the conspiracy described herein

## RULE 23 ALLEGATIONS

38.     Plaintiff LAWRENCE H. GRESS brings this action under Rule 23 of the Federal

Rules of Civil Procedure, for himself and as the representative of a Class of similarly situated

plaintiffs, defined as:

> All persons who received a "Violation Notice" or similar communication, issued
> by or in the name of any Illinois municipal corporation or other unit of local
> government, which communication alleges or asserts any traffic signal violation
> of the Illinois Motor Vehicle code or similar municipal ordinance, i) where such
> Violation Notice was generated in whole or in part based on data collected by a
> "Red-Light Camera" that was installed: a) after Sen. Martin Sandoval agreed to
> accept bribes to use his position as Chairman of the Senate Transportation
> Committee and its Red-Light Camera Subcommittee to kill legislation
> unfavorable to providers of Red-Light Cameras in Illinois, including, without
> limitation, legislation that would have banned the use of Red-Light Cameras in
> Illinois; or b) where placement of the Red-Light Camera(s) that collected the
> pertinent data was corruptly and fraudulent procured through bribes paid to public
> officials, such as, without limitation, Sen. Martin A. Sandoval, and ii) where, by
> reason of such Violation Notice recipient suffered an adverse legal consequence,
> including, without limitation, being required to pay a fee, fine, penalty, or
> surcharge; to pay a court filing or other legal or administrative fee; incurring
> attorney fees; becoming the subject of negative credit reports for unpaid
> "violations;" incurring entitlement to statutory damages under state or federal law
> as a result; having had driving privileges or vehicle registration suspended; and/or
> having a vehicle towed or immobilized as a result of an unpaid Violation Notice.

39.     Prosecution of this case by way of a class action is a superior method of resolving

these claims, as the average amount at issue here (in most cases, seeking recovery of $100 or

$200 for any individual violation notice) is relatively small.

40.     As such, any individual Class member's out-of-pocket and opportunity costs of

challenging a Violation Notice is substantially greater than the cost of the wrongfully assessed

fee or penalty.

41.     Total damages suffered by the plaintiff Class are sizable; Illinois local

governments collected more than $1 billion in RLC-generated fines from 2008 to 2018,

according to an analysis by the Illinois Policy Institute.

-13-

42. Municipalities that host SafeSpeed RLCs reportedly collected fines totaling more than $70 million from 2014 through 2016.

43. Upon information and belief, the total damages suffered by the Plaintiff Class approaches or exceeds $100,000.00 ($100 million).

44. The class of Plaintiffs in this class is so numerous that joining them individually would be impracticable.

45. Upon information and belief, the Plaintiff Class may exceed 100,000 members, which members can be readily ascertained by digital records generated and maintained by the various RLC providers in the state of Illinois.

46. The claim of the named Plaintiff is typical of those of all members of the proposed Plaintiff Class, as required by Rule 23(a)(3), in that he received a Violation Notice generated by an RLC that was corruptly and wrongfully installed, over repeated objections from IDOT, as a direct and proximate result of bribes paid to Sandoval and Ragucci, and improper influence of Sandoval over IDOT, and thereafter remained in place because of bribes paid to Sandoval to block legislation in the General Assembly that would have banned RLCs by repealing Section 11-208.

47. Other Class members, by definition, received Violation Notices generated by RLCs installed and placed into operation because of bribes, improper influence, subversion of IDOT application procedures, and greed.

48. On information and belief, multiple members of the Class are citizens of States different from any Defendant, as will be readily confirmed in discovery.

49. Numerous questions of law and fact exist that are common to the Plaintiff and the Class. The answers to these common questions are significant and will substantially advance the

adjudication and resolution of this case, and predominate over any questions that may affect only individual Class members, thereby satisfying Rule 23(a)(2) and 23(b)(3).

50.　These common question/common answer issues include:

a.　Whether SafeSpeed misrepresented and concealed material information in its mailings to and filings with the Illinois Department of Transportation concerning SafeSpeed's installation of RLCs at the Intersection of Route 83 and 22nd Street in Oakbrook Terrace in 2017, and other locations;

b.　Whether Defendants used or caused to be used the Unites States mail to convey to Class Members Violation Notices that they knew were based on data collected by RLCs that Defendants had installed and placed in operation through public corruption and honest services fraud as distinct from any bona fide concern about public safety;

c.　Whether SafeSpeed engaged in a fraudulent and/or deceptive scheme to deceive IDOT, citizens of Illinois, and the Illinois General Assembly as to the true nature of SafeSpeed's network of RLCs and conceal the fact that RLCs had been corruptly placed because of bribes, improper bullying and influence over IDOT, and a desire to generate mountains of cash, not promote public safety;

d.　Whether Defendants engaged in a pattern and practice of disseminating materially false information, misrepresentations, omissions, and concealment regarding Defendants' support of RLCs, including the myth that SafeSpeed was founded in 2007 as a reaction to an accident involving Nikki Zollar;

e.　Whether Defendants engaged in public corruption and the exchange of bribes for official acts in respect of the placement and maintenance in operation of RLCs, and thereby corruptly protected SafeSpeed RLCs from objections from IDOT or bills to repeal Section 11-208;

      f.      Whether the foregoing conduct continues to the present;

      g.      Whether Defendants' conduct injured Class members in their business or property within the meaning of the RICO statute;

      h.      Whether SafeSpeed and the other Defendants violated and conspired with each other and others to violate RICO by the conduct of an association-in-fact Enterprise, through a pattern of racketeering activity involving bribery of public officials, honest services fraud, and mail and wire fraud;

      i.      Whether Class members are entitled to compensatory damages and if so, the nature and extent of such damages; and

      j.      Whether Class members are entitled to treble damages under Civil RICO.

51.      Plaintiff, like all of the Class members, has been damaged by Defendants' misconduct, in that, among other things, he has suffered the consequences of receiving a Violation Notice, as set forth in the Definition of Class.

52.      The factual and legal bases of Defendants' misconduct are common to all members of the Class and represent a common thread of fraud, deceit, and other misconduct resulting in injury to Plaintiffs and Class members.

53.      Plaintiff will fairly and adequately represent and protect the interests of Class members, as required by Rule 23(a)(4).

54.      Plaintiff and his counsel are committed to the vigorous prosecution of this action on behalf of the Class and have the financial resources to do so.

55.      Neither Plaintiff nor his counsel has any interest adverse to the Class.

56.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy under Rule 23(b)(3).

57.     Absent a class action, most Class members would certainly find the cost of litigating their claims to be prohibitive, and would thus have no effective access to the courts or remedy at law.

58.     The class treatment of common questions of law and fact is thus superior to multiple individual actions or piecemeal litigation inasmuch as common questions of law and fact substantially predominate over any questions or law or fact unique to individual Class members.

59.     The named Plaintiffs will fully and adequately represent the interests of all members of the Plaintiff Class, and the damages suffered by the named Plaintiff, and the manner in which he was harmed, are wholly typical of the members of the Class.

60.     The named Plaintiff is represented by trial counsel, experienced and competent in all areas of law relating to this Complaint, who are prepared to fully and adequately prosecute this Action on behalf of their clients and on behalf of all members of the Plaintiff Class, as Class Counsel.

61.     Plaintiffs anticipate that administration of this Class, however numerous, will proceed smoothly, aided by the fact that the Defendants have maintained detailed and comprehensive electronic records identifying all Class members to whom they issued Violation Notices, as well as the date, time, and location of the infraction alleged in the Violation Notice.

62.     Plaintiffs seek the certification of a nationwide Class under their civil RICO claims, asserted for violations of 18 U.S.C. §1962(c) and 1962(d) under 1964(c) in this Complaint. All questions of law and fact are common to the civil RICO counts and predominate over individual questions. This case also presents common issues of fact and law that are each appropriate for issue-class certification under Rule 23 (c)(4), and the management of this action

may be facilitated through the certification of additional subclasses under Rule 23(c)(5), if necessary and appropriate.

**The Class Representative**

63.     Gress is the owner of a black 2008 Ford Taurus sedan automobile with VIN number 1FAHP25W48G102577 and License Plate "LG – TS" ("the Auto").

64.     On December 12, 2018, at approximately 8:00 pm, Gress was driving the Auto southbound on Route 83 in Oakbrook Terrace, approaching the Intersection with 22nd Street:



65.     At the Intersection, Gress used the right-turn lane to turn right and merge onto 22nd Street.

66.     Based on the foregoing, Gress received from Oakbrook Terrace ticket 90H5W97Y, citing a violation of 5/11-306(c) of the Illinois Vehicle Code as adopted by Section 70.01 of the City of Oakbrook Terrace Code, and demanding a payment of $100.00.

67.     The SafeSpeed RLCs at the Intersection that issued ticket 90H5W97Y were corruptly installed over repeated and longstanding objections from IDOT and from public

officials of neighboring Oak Brook and as a direct result of bribes paid to Sandoval and Ragucci, not a bona fide concern about public safety.

68.     The SafeSpeed RLCs at the Intersection were installed not out of any concern over public safety, but rather as a direct result of greed and public corruption, and as a direct and proximate result of bribes paid to Sandoval and Ragucci, the Mayor of Oakbrook Terrace.

69.     Defendants should not be permitted to retain the tainted monetary fruits generated by their criminal conspiracy.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS

70.     Sandoval was first sworn in as a State Senator in 2003.

71.     During his tenure in Springfield, Sen. Sandoval was most often associated with the phrase, "*What's in it for me?*"

72.     Sandoval used his power as a public official to line his own pockets by infiltrating and corrupting both public and private enterprises subject to his power and selling secret and unlawful indulgences to the highest bidder.

73.     Not long after it was founded in 2007, SafeSpeed turned to Sandoval to give SafeSpeed a "leg up" in the fiercely competitive market to place Red-Light Cameras in the suburban corridor southwest of Chicago.

74.     One authority describes Red-Light Cameras as follows:

A [Red-Light Camera] is a type of traffic enforcement camera that captures [an] image of [a] vehicle that has entered an intersection in spite of the traffic signal indicating red . . . . By automatically photographing vehicles that run red lights, the photo is evidence that assists authorities in their enforcement of traffic laws. . . . . . Typically, a law enforcement official will review the photographic evidence and determine whether a violation occurred. A citation is then usually mailed to the owner of the vehicle found to be in violation of the law. . . . . . . . There is debate and ongoing research about the use of red light cameras. Authorities cite public safety as the primary reason that the cameras are installed, while opponents contend their use is more for financial gain.

-19-

75. At least one authority has reported that the *primum mobile* in the placement of Red-Light Cameras is greed, not enhanced public safety:

> . . . regardless of where they're installed, red-light cameras lack clear-cut safety benefits. A 2018 study from Case Western Reserve University found red-light cameras likely do not increase traffic safety. Researchers looked at traffic accident data from Houston, which operated its red-light camera program from 2006 to 2010, and found that while T-bone collisions did indeed decrease during that time, non-angle collisions, such as rear-end crashes, actually increased. Moreover, rather than reducing traffic accidents, the study found that red-light enforcement cameras may have increased accidents overall. A similar study by the [Chicago] *Tribune* in 2014 found the same results: rear-end crashes were up 22%. In some cases, the number of crashes at an intersection increased after the camera was installed.

76. Not surprisingly, suppliers of Red-Light Cameras often seem anxious to characterize themselves as altruistic champions of public safety instead of opportunistic profiteers, seeking to monetize the nuisance-value of 100-dollar computer-generated traffic tickets.

77. A newspaper article dated May 30, 2017, quoted SafeSpeed "spokeswoman" Yvonne Davila -- who was then on the payroll at Chicago State University where Nikki Zollar served as a Trustee -- as stating that SafeSpeed COO Chris Lai had "misspoken" when he said a serious traffic accident involving Zollar and her mother-in-law had occurred in 2007 and prompted Zollar to found SafeSpeed out of an altruistic concern for public safety.

78. Davila clarified that, in fact, the accident referred to by Lai had occurred in 2011, four years after SafeSpeed was founded.

79. However, minutes of a meeting of the Board Of Trustees of the Village of Alsip on June 4, 2016, memorialize a pitch by Zollar and Omar Maani of SafeSpeed to provide Red-Light Cameras to that Village, thus (emphasis supplied):

> Representative [sic] from Safespeed to make a presentation to the Village of Board regarding Red Light Cameras and SafeSpeed's request to provide service to the Village of Alsip, as the current provider's contract expired 6/1/16. Omar

Maani and Nikki Zollar are the partners of Safespeed. Safespeed provides automated enforcement for traffic safety programs referred to red light running cameras. **Ms. Zollar explained an occurrence that had happened personally and the reasons to begin such a program**. The company has been in Chicago since 2007 and is the only US wholly owned company located in Chicago. They service over 30 communities to include Justice, Summit, Matteson, Evergreen Park, and Oak Lawn, just to name a few. They use infrared technologies and further explained the benefits of the company. Fees are collected when tickets are paid. Trustee [John] Ryan noted other towns using their services to include Berwyn, Burbank, Chicago Heights, Country Club Hills, Crestwood, Dolton, Hometown, and Tinley Park.

80.    On information and belief, the "occurrence that had happened personally and the reasons to begin such a program," referred to above, is the accident that Davila identified as having occurred in 2011, four years after SafeSpeed was founded.

81.    Falsely cloaking SafeSpeed in a mantle of altruism was part of the scheme to conceal the true nature of the Enterprise, whose sole purpose was to generate mountains of cash for the Defendants, without regard to public safety.

82.    In any event, suppliers of Red-Light Cameras have generally incentivized municipalities to permit them to install Red-Light Cameras not with promises of enhanced safety but rather by offering to split the collected proceeds of any tickets issued with the host municipality.

83.    While the terms of contracts between Red-Light Camera suppliers and host municipalities are subject to case-by-case negotiation, generally, the host municipality receives about 60% of the collected fines, leaving 40% for the supplier.

84.    On information and belief, a Red-Light Camera in a busy intersection (such as the Intersection) can generate very substantial cash flow, sometimes millions of dollars per annum.

85.    In July of 2003, a boom in Red-Light Cameras was just beginning in Chicago as the City adopted Chapter 9-102 to its municipal code to implement its "Automated Red Light Camera Program," Code 9-102-010 *et seq.* ("Chapter 9-102").

86.     Chapter 9-102 provides for a system of linking data generated by RLCs with the

City's administrative enforcement structure, thus:

(a)    The purpose of this chapter is to provide for the establishment of an
automated traffic law enforcement system which shall be administered by the
department of transportation pursuant to powers delegated to that department by
the traffic compliance administrator, in consultation with the office of emergency
management and communications and the department of finance and enforced
through a system of administrative adjudication within the department of
administrative hearings.

(b)    The system shall utilize a traffic control signal monitoring device which
records, through photographic means, the vehicle and the vehicle registration
plate of a vehicle operated in violation of Section 9-8-020(c). The photographic
record shall also display the time, date and location of the violation.

(c)    A program shall be established which utilizes an automatic traffic law
enforcement system at various vehicle traffic intersections identified by the
department of transportation, with the advice of the police department and the
office of emergency management and communications. The intersections chosen
for the program shall be located throughout the city.

87.     The Chicago Program's initial goal was to install Cameras at two busy

intersections: Peterson and Western and 55th and Western.

88.     To that end, a Committee was formed to identify a suitable supplier of Red-Light

Cameras for Chicago.

89.     Understandably, the competition to get the first toehold in Chicago's market for

Red-Light Cameras was fierce.

90.     Beginning in 2003, and for about eight years thereafter, John Bills, Chicago's

Assistant Transportation Commissioner, served on the Committee evaluating vendors to provide

Red-Light Cameras for the city's Digital Automated Red Light Enforcement Program.

91.     With Bills' support, the committee recommended awarding Chicago's first Red-

Light Camera contract to Redflex Traffic Systems of Phoenix, Arizona.

92.     Over the next eight years, Bills used his influence as a City transportation official to expand Redflex's network of Red-Light Cameras in Chicago.

93.     During Bills' tenure, Chicago's installed Red-Light Camera system grew to become the largest in the nation, mostly by installing Redflex Cameras.

94.     By the end of 2015, Chicago's Red-Light Cameras had collected more than $600 million in fines.

95.     However, Redflex did not become Chicago's leading provider of Red-Light Cameras in the years from 2003 through 2011 through merit.

96.     According to a Department of Justice press release,

 . . . the CEO of Redflex Traffic Systems Inc., Karen Finley . . . funnel[led] cash and other financial benefits to the city official, John Bills, and his friend, Martin O'Malley, in exchange for improper assistance in awarding city red-light camera contracts to Redflex. The benefits included golf trips, hotels and meals, as well as hiring O'Malley as a highly compensated contractor for Redflex, some of which compensation was passed on to Bills.

97.     In return for orchestrating Committee votes, leaking inside information to Redflex executives, and undermining bids from competing Red-Light Camera suppliers, Redflex CEO Finley rewarded Bills with cash payments of up to $2,000 for each of the 384 cameras Redflex contracted to install in the City, envelopes stuffed with cash, and personal benefits, including meals, golf outings, rental cars, airline tickets, hotel rooms, and other blandishments.

98.     Federal prosecutors pegged the total bribes paid to Bills at more than $2 million.

99.     Some of the bribes were given to Bills directly, while hundreds of thousands of dollars in cash was funneled to Bills through Bills' friend Martin O'Malley, whom Redflex hired to facilitate the payoffs.

100.     Eventually, Bills was convicted of 20 counts of bribery, conspiracy, and fraud and sentenced to a ten-year term of imprisonment.

101.    O'Malley, 75, was convicted of conveying envelopes stuffed full of thousands of dollars in cash from Redflex to Bills and sentenced to six months in prison.

102.    Finley was convicted of conspiracy to commit bribery and sentenced to a 30-month term of imprisonment.

103.    As Chicago was creating the largest network of Red-Light Cameras of any city in the nation, the General Assembly passed Illinois State Law, HB4835 effective May 2006, permitting the use of Red-Light Cameras and making the registered owner (or lessee) of a vehicle liable for any automated traffic law violations recorded by Red-Light Cameras.

104.    HB4835, now codified at 625 ILCS 5/11-208.6 (hereinafter "Section 11-208"), applies only to the counties of Cook, DuPage, Kane, Lake, Madison, McHenry, St. Clair, and Will and to municipalities located within those counties.

105.    The passage of Section 11-208 led to a land rush by RLC providers into municipalities southwest of Chicago, including municipalities in Sandoval's 11th Senate District, such as Bedford Park, Burbank, Cicero, Forest View, Lyons, McCook, Stickney, Summit, and Riverside.

106.    As Red-Light Cameras proliferated in municipalities outside Chicago, Sen. Sandoval seized the opportunity to help companies place Red-Light Cameras in the choicest Red-Light Camera locations in his District, so long as they were willing to "play ball" with him.

107.    In 2007, as Redflex was bribing Bills to consolidate Redflex's hold on Chicago, Zollar, Chris Lai, Khaled "Cliff" Maani, and Khaled Maani's son, Omar Maani, founded SafeSpeed to cash in on the trend, especially in the relatively untouched suburbs southwest of Chicago.

108.    By the time SafeSpeed was being launched, Zollar, Lai, and Khaled Maani were already partners in Chicago-based Triad Consulting Services, Inc. ("Triad"), an MWBE-certified entity incorporated in 1994 that contracts to provide janitorial services to, among others, the City of Chicago.

109.    According to Zollar, Omar Maani brought the idea of getting into the Red-Light Camera business to Zollar's attention at a time when Triad was looking to pivot into a new business.

110.    As such, the individuals and entities once affiliated or related to SafeSpeed include Triad; Zollar; Omar Maani; and The Maani Group, Inc., a corporation controlled by Omar Maani that was dissolved in 2014.

111.    In the course of Triad's competition for public-sector contracts, Triad's managers had learned the utility of cultivating close relationships with public officials in a position to help steer contracts to Triad.

112.    Because of Triad's dependence on political connections, the logical choice to lead Triad as its President and Chief Executive Officer was Zollar, a politically connected lawyer with longstanding ties to both Chicago Democrats and state GOP officials.

113.    From 1987-1990 Zollar had served as Chairwoman and Secretary of the Chicago Board of Election Commissioners.

114.    Zollar also served as Director of the Illinois Department of Professional Regulation in the administration of Illinois Governor Jim Edgar.

115.    After founding SafeSpeed, Zollar took a page from the Triad playbook to cultivate close relationships with public officials in a position to steer business to SafeSpeed, especially contracts for the most lucrative camera locations.

116.    SafeSpeed beat its competition to obtain contracts in River Forest, North Riverside, and Berwyn for cameras along a particularly lucrative four-mile stretch of Harlem Avenue southwest of Chicago.

117.    Reportedly, SafeSpeed cameras along that four-mile stretch issued more than $26 million in tickets in the three years from 2014 through 2016, suggesting a potential gross take for SafeSpeed of as much as $10.4 million.

118.    The cornerstone of SafeSpeed's strategy to gain a competitive edge in the fiercely competitive and largely fungible market for Red-Light Cameras was to hire public officials (such as mayors and police chiefs) to moonlight as commissioned, undisclosed sales agents ("Consultants") for SafeSpeed.

119.    To incentivize its commissioned, undisclosed sales agents, SafeSpeed promised the Consultants a percentage (generally about 3.5%) of the fines generated by the SafeSpeed cameras they "sold," payable monthly in arrears.

120.    In addition, SafeSpeed was always vigilant for opportunities to curry favor with public officials in a position to help SafeSpeed expand its base of installed Red-Light Cameras.

121.    Among the many public officials and Consultants corruptly recruited and incentivized by SafeSpeed to influence official actions are Sandoval (after Victor Reyes introduced SafeSpeed to Sandoval), and Oakbrook Terrace mayor Tony Ragucci, after SafeSpeed targeted the Intersection in Oakbrook Terrace as a very lucrative location for a Red-Light Camera.

122.    In 2012, Ragucci began to request that SafeSpeed Red-Light Cameras be installed at the Intersection after SafeSpeed became one of Ragucci's most generous campaign contributors.

-26-

123.    Thereafter, Ragucci made multiple requests to IDOT for approval of SafeSpeed Red-Light Cameras at the Intersection, which requests were uniformly rejected.

124.    In March 2012, IDOT completed road-widening and other improvements at the Intersection to improve traffic safety.

125.    In February 2013, Oakbrook Terrace and SafeSpeed tendered to IDOT a renewed application for SafeSpeed RLCs at the Intersection.

126.    Safespeed represented that even after IDOT's road-widening and other improvements, the Intersection remained unreasonably dangerous.

127.    On April 5, 2013, IDOT rejected the Oakbrook Terrace/SafeSpeed application on grounds that it was too early to determine whether the recently-completed road widening and other improvements at the Intersection would reduce crashes enough to moot the perceived need for Red-Light Cameras.

128.    IDOT advised Oakbrook Terrace/Safespeed to renew the application in 2015 if, by then, there were evidence that traffic accidents had not dropped.

129.    This sequence of events may have triggered a recollection of how Redflex had come to dominate the placement of Red-Light Cameras in Chicago.

130.    In any event, on August 2, 2013, Zollar and Maani induced Triad to make a campaign contribution to Sen. Sandoval for $2,000.

131.    On Oct. 14, 2013, Safespeed made a campaign contribution to Sen. Sandoval for $1,000.

132.    On Sept. 25, 2014, Triad contributed another $1,500 to Sen. Sandoval.

133.    On June 24, 2015, Triad donated another $2,000 to Sen. Sandoval, and The Maani Group Inc. concurrently made a donation to Sen. Sandoval, for $1,000.

134.    On Sept. 24, 2015, Omar Maani made a personal donation to Sen. Sandoval, for $5,000.

135.    On Nov. 18, 2015, Oakbrook Terrace/Safespeed submitted to IDOT a renewed application for cameras at the Intersection.

136.    On March 3, 2016, and again on March 16, 2016, IDOT found that SafeSpeed's application did not justify the installation of Red-Light Cameras at the Intersection.

137.    However, on May 20, 2016, IDOT did a sudden about-face, approving the application to install SafeSpeed Cameras.

138.    IDOT's abrupt about-face occurred only after Sandoval personally intervened on SafeSpeed's behalf by bullying, threatening, and berating IDOT's head.

139.    As alleged, *supra*, during 2016 SafeSpeed agreed to pay to Sandoval $20,000 per annum as a "campaign contribution,"

140.    In January 2017, the Board of Trustees of the neighboring Village of Oak Brook reacted to the installation of SafeSpeed cameras at the Intersection by adopting an Ordinance banning the installation of Red-Light Cameras in Oak Brook on grounds that

> contractors promoting red light cameras throughout Illinois and the United States have sought to corrupt local law enforcement by turning it into a moneymaker for political leaders, who in turn have signed contracts granting substantial profits to red light contractors, who in turn have paid contributions to political decision makers, all to the detriment of the safety and financial condition of drivers and the commercial vitality of any area afflicted with red light cameras.

141.    On January 23, 2017, Rep. Peter Breen, a Republican from Lombard, filed with the Clerk of the House HB0506, a bill officially described as "[a]mend[ing] the Illinois Vehicle Code [to] [p]rovide[] that a municipality or county authorized under the Code to use an automated traffic law enforcement system may not enact an ordinance providing for an automated traffic law enforcement system **at the intersection of Illinois Route 83 and 22nd**

**Street in the City of Oakbrook Terrace** and any provision of an ordinance enacted by a municipality or county prior to the effective date of the bill that is inconsistent with the prohibition is null and void. Effective immediately." (Emphasis supplied.)

142.     The next day, on January 24, 2017, the Village of Oak Brook engaged lawyer Frank Avila to file an action seeking to enjoin the installation of SafeSpeed Red-Light Cameras at the Intersection.

143.     Avila described the lawsuit as

. . . a law suit on behalf of the Village of Oak Brook against the City of Oak Brook Terrace, [Tony Ragucci,] The Mayor of the City of Oak Brook Terrace [], the Trustees of Oak Brook Terrace [], Triad Consulting Services Inc., Nikki Zollar (The CEO of Triad Consulting Services Inc., and the President of SafeSpeed LLC) [], SafeSpeed LLC, and the Illinois Department of Transportation (IDOT).

This is a civil action for declaratory, injunctive and other appropriate relief challenging the decisions of the Defendant Illinois Department of Transportation (IDOT) to allow, and Defendant City of Oak Brook Terrace to cause, the installation and operation of red light cameras for an automated traffic law enforcement system at 2 corners of the intersection of Illinois 83 and 22nd Street. . . . .

IDOT did not follow proper procedures and there was political pressures by elected officials including a State Senator that is not even in DuPage County and is/was part of the infamous Hispanic Democratic Organization. Elected officials made calls on behalf of a private company that has given donations to at least 1 of these elected officials. They called IDOT on behalf of SafeSpeed and IDOT did a 24 hour traffic study instead of another year of data as they said they needed.

There is no safety issue and a study done by the Oak Brook Police Department clearly concludes that accidents and violations at this intersection are actually down. This has nothing to do with safety but is all about revenue for the government of Oak Brook Terrace and harming businesses in Oak Brook and Oak Brook Terrace, resents of Oak Brook and Oak Brook Terrace and all the hundreds of thousands of visitors who visit Oak Brook and Oak Brook Terrace to dine, shop, go to the cinema and otherwise enjoy this area.

Red Light Cameras have even caused accidents in some areas based on studies--especially rear end collisions.

Schaumburg had Red Light Cameras by their Woodfield Mall and the businesses lost customers and the government lost revenue and Schaumburg removed the Red Light Cameras.

Red Light Cameras are bad for the entire region and Oak Brook is an economic engine for the region. Red Light Cameras are bad public policy and there is politics and money that we are concerned about and thus this should be halted at least until we can get some questions answered and we believe it should be halted permanently and reversed.

We are filing suit on behalf of the Village of Oak Brook tomorrow. It is a great honor to serve them as their Attorney and Counselor.

I hope this is the 1st Domino that stops all Red Light Cameras in Illinois.

144. In January 2017, Oak Brook's official Village Attorney was Stewart Diamond, a senior partner of the firm Ancel Glink.

145. Oak Brook asked Diamond and Ancel Glink to take the laboring oar in prosecuting the lawsuit against Oakbrook Terrace and the new RLCs at the Intersection.

146. On January 25, 2017, Ancel Glink filed in the Circuit Court of DuPage County, *Village of Oak Brook v. Tony Ragucci, Mayor of the City of Oakbrook Terrace, et al.*, Case 2017MR000118 ("the Complaint").

147. In a concurrently-issued press release, Oak Brook expressed its belief that "political pressure from several State Senators caused IDOT to improperly change its view."

148. In addition to the Village of Oakbrook Terrace and its Mayor, Tony Ragucci, the Complaint named as defendants IDOT; various Oakbrook Terrace elected officials; SafeSpeed; Zollar, and Triad.

149. The Lawsuit sought injunctive relief to halt the installation and operation of RLCs at the Intersection.

150. The suit alleged Oakbrook Terrace officials voted to install Red-Light Cameras in the Intersection "unfairly and irrationally based not upon a serious traffic problem or a

significant number of accidents but rather efforts by the Defendant City of Oakbrook Terrace to increase its revenue" and that the SafeSpeed cameras continued "an unnecessary tax and . . . an improper and unconscionable use of public funds."

151.   Thereafter, notwithstanding evidence of public corruption, and over objections from Frank Avila and Oak Brook Village Trustees Michael Manzo and Don Adler, the lawsuit was abandoned, and Oak Brook's effort to stop the installation of SafeSpeed cameras at the Intersection failed.

152.   By then, HB0506 had been referred to the House Rules Committee, where it languished and died.

153.   By 2019, Oakbrook Terrace was collecting more than $5 million per annum in RLC fines, of which nearly $2.2 million was pocketed by SafeSpeed.

## The Rise of Public and Legislative Opposition to RLCs

154.   By 2015, substantial popular opposition to RLCs had begun to coalesce on grounds that Section 11-208 seemed primarily to be a means of transferring wealth from motorists to municipalities, public officials, and their politically-connected (and corrupt) cronies and "Consultants," as distinct from a means of enhancing public safety.

155.   The growing popular opposition to RLCs set off a steady drumbeat of legislative activity in the General Assembly to ban RLCs by repealing Section 11-208.

156.   On January 14, 2015, Rep. David McSweeney, a Republican from Barrington Hills representing District 52, filed with the Clerk of the House HB0173, a bill that would have banned RLCs by repealing Section 11-208.6.

157.   Thereafter, at least one co-sponsor of HB0173 was added in the House on each of 1/23/2015, 1/26/2015, 2/6/2015, 2/19/2015, 2/20/2015, 4/14/2015, 4/16/2015, 4/20/2015,

4/21/2015, and 4/22/2015, when the bill was passed with broad, bipartisan support (79 yeas, 26 nays, and 4 voting present).

158.    On April 22, 2015, HB0173 arrived in the Senate, where it was assigned to the Transportation Committee chaired by Sen. Sandoval.

159.    On May 31, 2016, HB0173 was given the kiss of death and referred to the Assignments Committee, where it languished and died.

160.    As Sandoval has now admitted, it was during 2016 that Sandoval asked Omar Maani of SafeSpeed for $20,000 in annual campaign contributions in return for Sandoval's official support for SafeSpeed and its business interests.

161.    Sandoval's corruptly acquired "support" included summarily killing the multiple bills that would have repealed Section 11-208 (and thereby banned all of SafeSpeed's RLCs) and HB0506, a bill that would have banned SafeSpeed's RLCs only at the Intersection.

162.    On January 11, 2017, Rep. McSweeney filed with the Clerk of the House HB0321, another bill that would have banned RLCs by amending Section 11-208.

163.    On March 29, 2017, HB0321 was assigned to the House Red Light Camera Subcommittee, which, on March 31, 2017, referred HB0321 to the Rules Committee, where it languished and died.

164.    On January 10, 2019, Rep. McSweeney filed with the Clerk of the House HB0322, yet another bill that would have banned RLCs by amending Section 11-208.

165.    On February 5, 2019, HB0322 was referred to the House Vehicles and Transportation Committee.

166.    On March 29, 2019, HB0322 was assigned to the Rules Committee, where it has remained to the present day.

167.    More recently, on October 7, 2019, Rep. Grant Wehrli filed with the Clerk of the House HB3909, a bill to ban RLCs by amending Section 11-208.

168.    After a first reading on October 17, 2019, HB3909 was referred to the House Rules Committee.

169.    On Oct. 23, 2019, state Rep. Kambium Buckner, D-Chicago, filed House Bill 3927 in the Illinois General Assembly, seeking to repeal Section 11-208.

170.    On October 28, 2019, HB3927 was referred to the Rules Committee.

**The Corrupt Racketeering Scheme is Exposed**

171.    On September 24, 2019, the FBI executed a Search Warrant on Sandoval's offices in the General Assembly, in Cicero, and in his home, carting off multiple computers and boxes of documents.

172.    The Search Warrant sought items of evidence relating violations of various sections of Title 18 of the United States Code, including sections alleged to have been violated by Defendants in this action as predicate acts, such as § 371 (Conspiracy to Defraud the United States); § 666 (Theft or bribery concerning programs receiving Federal funds); § 1341 (Mail Fraud); § 1343 (Wire Fraud); § 1346 (Honest Services Fraud); § 1349 (Conspiracy); and § 1951 (Interference with commerce by threats or violence).

173.    The only copy of the Search Warrant publicly available around the time of the Sandoval raids was heavily redacted to obscure the identity of the persons and entities named therein.

174.    On September 26, 2019, the FBI raided the village halls of three southwest suburbs, McCook, Lyons, and Summit, all of which had contracted for SafeSpeed Red-Light Cameras.

175.     On October 11, 2019, the Illinois Senate released an unredacted copy of the Search Warrant served on Sandoval's offices on September 24, 2019.

176.     The unredacted Search Warrant revealed that the items to be seized from Sandoval's offices related to various individuals, including individuals alleged to be members of the Racketeering Conspiracy alleged herein.

177.     In addition, the Search Warrant sought items related to Red-Light Cameras, and HB0173, the bill Sandoval corruptly killed "to protect" SafeSpeed.

178.     On October 11, 2019, the day the unredacted Search Warrant was released, Sandoval resigned his position as Chairman of the Senate Transportation Committee.

179.     On November 27, 2019, Sandoval resigned his position as a State Senator, effective January 1, 2020.

180.     In late 2019, the FBI seized $60,000 in cash in a raid of Tony Ragucci's home and seized $51,000 in cash from a safe in the home of Jeffrey Tobolski, another mayor in a southwestern suburb with SafeSpeed Cameras.

**Sandoval Admits that he "Protected" SafeSpeed in Exchange for Bribes**

181.     On January 27, 2020, John R. Lausch Jr., the United States Attorney for the Northern District of Illinois filed a two-count Information against Sandoval.

182.     Count I of the Information states:

[Martin A. Sandoval], as an agent of the State of Illinois, namely, a State Senator and Chairman of the Senate Transportation Committee, . . . corruptly solicited, demanded, agreed to accept, and accepted things of value, namely, money, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the State of Illinois involving . . . continued support for the operation of red light cameras in the State of Illinois, including opposing legislation adverse to the interests of the red-light-camera industry; In violation of Title 18, United States Code, Section 666(a)(l)(B).

-34-

183. On January 28, 2020, Sandoval appeared for his arraignment before the Honorable Andrea Wood, District Court Judge.

184. There, in open Court and under oath, Sandoval plead guilty to the two-counts of the Information, pursuant to a written Plea Agreement.

185. The Plea Agreement recites that Sandoval "will plead guilty because he is in fact guilty of the charges contained in Counts One and Two of the information" and that "[i]n pleading guilty, [Sandoval] admits the [] facts [set forth in the Information] and that those facts establish[ed] [Sandoval's] guilt beyond a reasonable doubt."

186. Sandoval stated in open Court and under oath that the Plea Agreement did not contain any misstatement of fact.

187. The Plea Agreement recites the following factual basis for Count I:

Beginning in or around 2016, and continuing until in or around September 2019, . . . SANDOVAL, as . . . a State Senator and Chairman of the Senate Transportation Committee, . . . corruptly solicited, demanded, agreed to accept, and accepted . . . money, intending to be influenced and rewarded in connection with . . . [his] continued support for the operation of red- light cameras in the State of Illinois, including opposing legislation adverse to the interests of the red-light-camera industry, in violation of Title 18, United States Code, Section 666(a)(1)(B).

Company A was a Chicago-area company that provided red-light cameras that enabled municipalities to enforce certain traffic violations and issue traffic-violation tickets. Company A obtained a portion of the proceeds generated from the approved- and-paid-for violations.

The Illinois Senate Transportation Committee was responsible for considering proposed legislation concerning the regulation of red-light cameras. The Illinois Department of Transportation ("IDOT") had to approve the installation and operation of red-light cameras within the state.

Beginning in or around 2016 and continuing until in or around 2019, SANDOVAL solicited, agreed to accept, and accepted financial and other benefits from someone who had an interest in Company A ("CW-1"), in return for using SANDOVAL's official position as an Illinois State Senator and Chairman of the Transportation Committee to block legislation harmful to the red-light-camera industry and to advise and influence IDOT to allow Company A to install and

operate red-light cameras at additional intersections. Unbeknownst to SANDOVAL, CW-1 began cooperating with law enforcement in or around 2018.

In or around 2016, SANDOVAL asked CW-1 for $20,000 in annual campaign contributions in return for SANDOVAL's official support for Company A and its business interests. CW-1 agreed, and Company A subsequently made the contributions from Company A and other entities to conceal the fact that Company A was making the contributions to SANDOVAL.

On or about August 16, 2017, SANDOVAL spoke by phone with CW-1. During the call, SANDOVAL discussed splitting up Company A's annual campaign contribution to SANDOVAL into smaller amounts. CW-1 told SANDOVAL that CW-1 had provided half of Company A's annual campaign contribution, and SANDOVAL said it was not a problem for Company A's President to break up the annual contribution into two contributions because CW-1 said Company A's President did not want the contribution to "shout out," meaning raise a red flag. SANDOVAL said, "I can see if I can … find out from anyone when the next reporting period, and we will do it right, right after that. Kind of, just kind of not make it obvious." Following publicity regarding SANDOVAL's relationship with Company A, SANDOVAL tore up the check provided by CW-1, arranged for an entity unrelated to Company A to make a $10,000 contribution to a campaign associated with SANDOVAL, and agreed to explore other ways for Company A to make its annual campaign contribution.

On or about March 19, 2018, SANDOVAL spoke by phone with CW-1. During the call, SANDOVAL agreed to accept $10,000 in cash to be used for campaign-related expenses and agreed to block legislation harmful to the red-light-camera industry.

Specifically, CW-1 said that CW-1 had spoken with Individual A, a Company A sales agent, who said that CW-1 could provide SANDOVAL with cash to be used to pay for campaign expenses. SANDOVAL responded, "Yeah," and said he would have someone he worked with ("Co-Schemer A") coordinate with CW-1 to obtain the cash. CW-1 agreed, referred to state legislation that would ban red-light cameras, and asked for SANDOVAL to provide assurance that CW-1 should not worry about that legislation. SANDOVAL assured CW-1 that CW-1 should not worry about the legislation and said, "I'll have [Co-Schemer A] call ya." SANDOVAL subsequently arranged for Co-Schemer A to collect $10,000 in cash from CW-1 later that day.

In or around July 2018, SANDOVAL solicited $5,000 per month for using his position in the Illinois Senate to protect Company A's interests. Specifically, on or about July 31, 2018, SANDOVAL met with CW-1 at a restaurant in Burr Ridge, Illinois. During the meeting, SANDOVAL discussed receiving payment for his official support of Company A. SANDOVAL asked, "Can I bring up something personal with you?... You've been good to me, politically. But I've learned that there are people who helped [Company A] who get a monthly, um…"

CW-1 interjected, "Consulting fee, sales-consulting fee." SANDOVAL continued, "When they have helped with the sighting of a camera…. On a monthly basis, [ad] infinitum." CW-1 responded, "100%. They get a percentage of the revenue that is brought in by [a] specific community." SANDOVAL said, "Like I did in Oakbrook [Terrace]." CW-1 agreed.

SANDOVAL asked, "So why don't I get that offer?" CW-1 discussed the possibility of paying SANDOVAL, who said, "It galls me to know, but because we've established such a great relationship, um, 'cause you know I'll go balls to the walls for anything you ask me…. It's hard for me to swallow how [people] make so much off of you. Right? And I gotta do the work." SANDOVAL acknowledges that he sought to receive cash payments from CW-1 in return for SANDOVAL's official acts benefitting CW-1 and Company A and made these statements for this purpose. Later, CW-1 and SANDOVAL discussed how SANDOVAL had been a friend of the red-light-camera industry and had used his position as Chairman of the Transportation Committee to ensure that bills harmful to the red-light-camera industry were not passed.

Later during the conversation, SANDOVAL discussed being paid to act as Company A's "protector" in the Illinois Senate. When discussing the amount of the payment he would receive, Sandoval said, "I usually say, 'What's reasonable? You tell me.'" CW-1 said that CW-1 did not know how to value SANDOVAL's support for Company A, and SANDOVAL said, "I'm not trying to be dramatic, but I'm telling you the vultures would be all over that shit [red-light cameras] if you had the wrong person there." SANDOVAL said, "I think the protector aspect, it never changes. If there's a . . . bill or something like that, if you set a fee, a protector fee, unless there's something really fucking extraordinary." CW-1 asked how much SANDOVAL wanted to be paid in protection money for acting to advance Company A's interests in the Illinois Senate, and SANDOVAL asked, "But how would we do that? So how many companies do you have?... Do you have a bologna company or something innocuous?" CW-1 and SANDOVAL discussed ways to make the payment, and CW-1 asked SANDOVAL to provide the amount of the payment. SANDOVAL said, "I can't say. It would have to come from you. That's just not my style." CW-1 asked, "[J]ust off the top of your head, what pops into your head?" SANDOVAL responded, "Five," meaning $5,000. CW-1 asked, "Five a month?" SANDOVAL responded, "Yeah." CW-1 agreed to pay SANDOVAL $5,000 per month.

On or about August 29, 2018, SANDOVAL met with CW-1 at a restaurant in Burr Ridge. During the meeting, SANDOVAL accepted from CW-1 $15,000 in cash, which constituted protection money for acting to advance Company A's interests in the Illinois Senate. By September 2019, SANDOVAL had accepted a total of approximately $70,000 in protection money from CW-1.

SANDOVAL also engaged in corrupt activities with other public officials and accepted money from other people in return for using his position as an Illinois State Senator to attempt to benefit those people and their business interests. In

total, SANDOVAL accepted over $250,000 in bribes as part of criminal activity that involved more than five participants. In doing so, SANDOVAL directed other criminally responsible individuals, including Co-Schemer A and Individual A.

188.    During the course of his colloquy with Judge Wood regarding the guilty plea, Sandoval identified "Company A" as SafeSpeed.

189.    The reference to "Company A's President" in the Plea Agreement is, therefore, a reference to Nikki Zollar, the President of SafeSpeed.

190.    On information and belief, the individual "with an interest in Company A" referred to in the Plea Agreement as "CW-1" is SafeSpeed stakeholder Omar Maani.

191.    According to the Plea Agreement, "CW-1 . . . referred to state legislation that would ban red-light cameras, and asked for SANDOVAL to provide assurance that CW-1 should not worry about that legislation. SANDOVAL assured CW-1 that CW-1 should not worry about the legislation . . . ."

192.    The reference to worrisome "state legislation" in the plea agreement is a reference to multiple bills (including the broadly-supported HB0173) introduced to ban RLCs in the state of Illinois generally, and HB0506, a bill specifically seeking to ban SafeSpeed's lucrative RLCs at the Intersection.

193.    Sandoval's Plea Agreement set forth above in pertinent part clearly describes, under oath, the contours of the Enterprise alleged herein.

194.    According to the Plea Agreement, Sandoval said to Omar Maani, "I'm not trying to be dramatic, but I'm telling you the vultures would be all over that shit [red-light cameras] if you had the wrong person there." Sandoval also said, "I think the protector aspect, it never changes. **If there's a . . . bill or something like that**, if you set a fee, a protector fee, unless there's something really fucking extraordinary."

195.    The record demonstrates that there were, as SafeSpeed's "Protector" said, multiple bills that could have put SafeSpeed out of business, all of which were killed thanks to the "protector fees prematurely" SafeSpeed paid to Sandoval.

## COUNT I
## VIOLATION OF 18 U.S.C. §1962(C)

196.    Plaintiffs incorporate by reference all preceding paragraphs.

197.    Section 1962(c) of RICO provides that "it shall be unlawful for any person employed by . . . any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ."

198.    Defendants and their co-conspirators, as identified herein, are "persons" within the meaning of 18 U.S.C. § 1961(3), who conducted the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

199.    The Enterprise was engaged in, and the activities of the Enterprise affect, interstate commerce, as citizens of other states are among the Class members.

200.    Instrumentalities and channels which serve as the media for the movement of goods and persons in interstate commerce or for interstate communications include highways, city streets, telephone lines, and vehicles, such as the highways and streets that host SafeSpeed RLCs.

201.    An instrumentality of interstate commerce need not stretch across State lines but may operate within a particular State as a link in a chain or system of conduits through which interstate commerce moves.

202.    Furthermore, and in any case, a substantial part of the acts described herein, including the predicate acts of mailing and acts of various Enterprise participants, affected interstate commerce.

**The Enterprise**

203.    The association-in-fact Enterprise consists of Defendants SafeSpeed, Zollar, and Omar Maani, along with Sandoval and the other named Defendants, and their officers, employees, and agents, among others, as identified in this Complaint. SafeSpeed created, controlled, and conducted the Enterprise to develop and effectuate every aspect of the scheme, as alleged above. SafeSpeed created and/or used this association-in-fact Enterprise – an ongoing organization functioning as a continuing unit – as a separate entity and tool to effectuate the pattern of racketeering activity that damaged the Class by issuing ticket on the demonstrably false pretense that they had been approved by public officials and IDOT out of a concern for public safety, instead of sheer greed.

204.    SafeSpeed, acting through Zollar, exerted ongoing and continuous control over the Enterprise, and participated in the operation or management of the affairs of the Enterprise, through the following instrumentalities:

> a.    asserting direct control over false, deceptive, and misleading information disseminated to the Illinois General Assembly regarding Sandoval's support, *vel non*, of legislation or other official acts potentially affecting SafeSpeed and the RLC industry;

> b.    asserting direct control over the creation and operation of the elaborate scheme used to create a small army of undisclosed sales agents

("Consultants") and conceal the bribes that induced Sandoval's support of SafeSpeed and its corruptly placed and maintained RLCs;

c.     placing employees and/or agents in positions of authority and control in the Enterprise; and

d.     mailing documents (including Violation Notices generated by corruptly placed RLCs) containing misrepresentations and omissions to the Class.

205.    From its inception, the Enterprise had a clear decision-making hierarchy or structure, with SafeSpeed, acting principally through Zollar and Omar Maani, positioned at the top.

206.    SafeSpeed paid its "Consultants," not as true employees, but rather as co-conspirators, intent on helping the Enterprise succeed in promoting the "money machine" SafeSpeed had created and concealed, by misrepresentations and omissions, the corrupt source of SafeSpeed's success.

207.    Though SafeSpeed, through Zollar and Omar Maani, exercised and continues to exercise control of the Enterprise, all of the Enterprise's members are distinct from the Enterprise and its activity, and each exercised and continues to exercise control over various functions of the Enterprise.

208.    The persons and entities comprising the Enterprise associated together for the common purpose of allowing SafeSpeed to subvert and corrupt the operation of IDOT and the General Assembly so as to "protect" SafeSpeed's money machine from any threat, including IDOT opinions that RLCs were not justified by safety concerns and the burgeoning movement to repeal Section 11-208.

209.    The RLC network corruptly developed by SafeSpeed, through Zollar and Omar Maani, and the other Defendants, was designed to be invulnerable to regulation by IDOT or legislative action, and to conceal the breadth of SafeSpeed's corruption and bribery of public officials, all as part of the scheme to defraud the Plaintiffs and Class, was and is the passive instrument of Defendants' racketeering activity, and together, constitutes an alternative "enterprise" as that term is defined in 18 U.S.C. § 1961(4).

**Pattern of Racketeering**

210.    This Complaint details the ongoing pattern of racketeering based on facts that are known to Plaintiffs and their counsel. It is filed without the benefit of discovery, which will almost certainly uncover many more predicate acts and further demonstrate the breadth and scope of the Enterprise's racketeering.

211.    The Enterprise - with SafeSpeed at the hub, acting through Zollar and Omar Maani, engaged in a pattern of racketeering activity.

212.    From no later than 2016 and at least through October 11, 2019, Defendants and the Enterprise, as well as others known or unknown, being persons employed by and associated with SafeSpeed and the other Defendants identified herein, engaged in activities that affected and affect interstate commerce, unlawfully and knowingly conducted or participated, directly or indirectly, in the affairs of the Enterprise through a pattern of racketeering activity, that is, through the commission of two or more racketeering acts, as set forth herein.

213.    The foregoing pattern of racketeering activity is distinct from the Enterprise itself, which does not solely engage in the above-described acts.

214.    Defendants have conducted and participated in the affairs of the Enterprise through a pattern of racketeering activity that includes predicate acts indictable under 18 U.S.C.

§ 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 1346 (deprivation of honest services through bribes and kickbacks) through the aforementioned actions.

215. In implementing the fraudulent scheme, SafeSpeed was aware that the IDOT and the Illinois General Assembly depended on the honesty of SafeSpeed and the other Defendants to represent the basis for their support of RLCs truthfully.

216. As detailed above, the fraudulent scheme consisted of, *inter alia*: using mail fraud to enable SafeSpeed (a) to obtain, exert, and deliberately misrepresent its corrupt control over Sandoval; and (b) suppress and conceal the level of such control and support from the Illinois General Assembly and the citizens of the State of Illinois.

217. The unlawful predicate acts of racketeering activity committed by Defendants had a common purpose, were related, and had continuity. From its inception, the Defendants' scheme depended upon concealing the breadth of SafeSpeed's bribery of public officials.

218. The Enterprise used the mail to create, execute and manage their scheme, acting in violation of 18 U.S.C. § 1341.

219. By misrepresenting SafeSpeed's entitlement to fines generated by corruptly placed and maintained RLCs in Violation Notices disseminated via the U.S. mail, the Enterprise perpetrated these unlawful predicate acts.

220. The predicate acts committed by the Enterprise were and are similar, continuous, and related.

221. SafeSpeed's bribes to Sandoval were substantial and spanned multiple years.

222. Conscious of the wrongfulness of its racketeering conduct, SafeSpeed actively concealed from the Illinois General Assembly and others the true source of its success.

223.    This consistent message - denying the breadth of its true corruption with the pretense that it was motivated by a desire to promote public safety - illustrates how the predicate acts of mail fraud were similar, continuous, and related.

224.    The scheme was calculated to ensure that Plaintiffs and the Class would suffer as Defendants monetized the nuisance value of computer-generated 100-dollar tickets.

225.    The targets of the Enterprise and the ultimate victims of SafeSpeed's scheme and predicate acts of mail fraud number in the many thousands, as discovery will reveal.

226.    Each fraudulent mailing of a Violation Notices issued by an RLC procured through fraud, and public corruption constitutes an act of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

227.    Collectively, these violations, occurring over several years, are a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

228.    Each activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs and the Class.

229.    All predicate acts committed by Defendants, and the Enterprise are related and were committed with a common scheme in mind: to bilk Illinois citizens out of fines generated by RLCs placed by bribing public officials and conceal those bribes and public corruption to ensure that the RLCs could continue to generate mountains of cash.

230.    Defendants' conduct of the Enterprise was designed to, and succeeded in, defrauding the Illinois General Assembly and in ultimately depriving Plaintiffs and the Class of millions of dollars in fines corruptly collected by SafeSpeed and its catamites.

## COUNT II
## VIOLATION OF 18 U.S.C. §1962(D) BY
## CONSPIRING TO VIOLATE 18 U.S.C. §1962(C)

231.   Plaintiffs incorporate by reference all preceding paragraphs.

232.   Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

233.   Defendants violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the § 1962(c) Enterprise described previously through a pattern of racketeering activity. Defendants, co-conspirators, and Enterprise participants agreed to join the conspiracy, agreed to commit and did commit the acts described herein, and knew that these acts were part of a pattern of racketeering activity.

234.   Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiffs and the Class of money.

235.   The nature of the above-described acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that Defendant, co-conspirators, and Enterprise participants not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

236.   As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiffs and the Class have been and are continuing to be injured in their business or property, as set forth more fully above.

## JURY DEMAND

Plaintiffs demand trial by jury on all claims.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all Class Members, respectfully request that this Court enter judgment in his favor and against Defendants and enter an Order:

A.  Authorizing, directing, and supervising the conduct of early and expedited discovery on the allegations of this Complaint;

B.  Awarding Plaintiffs and the Class treble (three times) their actual damages on their RICO claims, together with costs and reasonable attorneys' fees;

C.  Awarding Plaintiffs and the Class their costs and expenses in this litigation, including reasonable attorneys' fees and expert fees; and

D.  Awarding Plaintiffs and the Class such other and further relief as may be just and proper under the circumstances.

[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]

Dated this 2nd day of February 2020

                Respectfully submitted,

                LAWRENCE H. GRESS, on behalf of himself and others similarly situated,

By: _____
                Kent Maynard, Jr.
                One of their Attorneys

Kent Maynard, Jr.
KENT MAYNARD & ASSOCIATES LLC
53 W. Jackson Blvd., Suite 1240
Chicago, Illinois 60604
312.423.6586
312.878.1553 FAX