**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LAWRENCE H. GRESS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 20-cv-756 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| SAFESPEED, LLC, NIKKI ZOLLAR, | ) | |
| CHRIS LAI, KHALID ("CLIFF") MAANI, | ) | |
| OMAR MAANI, TONY RAGUCCI, | ) | |
| MARTIN SANDOVAL, PATRICK | ) | |
| DOHERTY, LOUIS PRESTA, BILL HELM, | ) | |
| JEFF TOBOLSKI, and JOHN O'SULLIVAN, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In his governing first amended complaint [78] ("Complaint"), Plaintiff Lawrence Gress ("Plaintiff"), on behalf of himself and others similarly situated, brings suit against SafeSpeed, LLC ("SafeSpeed"), Nikki Zollar ("Zollar"), Chris Lai ("Lai"), Khalid "Cliff" Maani ("Cliff Maani"), Omar Maani, Tony Ragucci ("Ragucci"), Martin Sandoval ("Sandoval"), Patrick Doherty ("Doherty"), Louis Presta ("Presta"), Bill Helm ("Helm"), Jeff Toboski ("Toboski"), and John O'Sullivan ("O'Sullivan") for alleged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Currently before the Court are motions to dismiss filed by Ragucci [79], Lai, SafeSpeed, and Zollar [83], the City of Oakbrook Terrace [86], Khalid [88], and O'Sullivan [90], as well as a supplemental motion to dismiss filed by Ragucci [87]. For the following reasons, the City of Oakbrook Terrace's motion [86] is denied as moot as Plaintiff has clarified that he did not intend to include the City as a Defendant in the latest version of his Complaint, see [110] at 2-3. Ragucci's motions [79] and [87], Lai, SafeSpeed, and Zollar's motion [83], Khalid's motion [88], and O'Sullivan's motion [90] are all granted. The Complaint is

dismissed for lack of standing. Given that (1) Plaintiff already has had an opportunity to amend his complaint and (2) the standing obstacle appears to be insurmountable through an amended pleading, especially in view of the extensive briefing on the motions to dismiss, the Court will not prolong this litigation any further in the district court. A final judgment will be entered consistent with Federal Rule of Civil Procedure 58. Civil case terminated.

## I.    Background

The following facts are drawn from the Complaint [78]. All well-pled facts are presumed to be true for purposes of Defendants' motions to dismiss. See *White v. United Airlines, Inc.*, 987 F.3d 616, 620 (7th Cir. 2021). Plaintiff is a citizen and resident of Illinois. His lawsuit arises out of a traffic ticket he received on December 12, 2018 in the City of Oakbrook Terrace, Illinois ("City"). At approximately 8:00 p.m. that night, Plaintiff was driving a black 2008 Ford Taurus sedan (the "Auto") southbound on Route 83. At the intersection with 22nd Street, Plaintiff "used the right-turn lane to turn right and merge onto 22nd Street." [78] at 18. Plaintiff does *not* allege that he was obeying all traffic laws when he made this maneuver. A Red-Light Camera ("RLC") installed at the intersection recorded Plaintiff. Based on that recording, Plaintiff subsequently received from the City a ticket for violating a provision of the Illinois Vehicle Code, 625 ILCS 5/11-306(c). That provision requires a driver approaching an intersection with a steady red traffic light, and no sign prohibiting right-hand turns on red, to come to a complete stop and yield to any approaching vehicles or pedestrians before making a right-hand turn. See *id*. § 5/11-306(c)(1), (3). The fine for Plaintiff's ticket was for $100, which Plaintiff alleges he was "required to pay," [78] at 18, but not that he *did* pay.

The Complaint alleges that the RLC that recorded Plaintiff, as well as RLCs "in villages and municipalities ringing Chicago," were put in place as a result of a "racketeering Enterprise"

2

operated by Defendants. [78] at 1-2. The Enterprise (described in greater detail below) allegedly involved the payment of bribes to public officials, who would influence or approve the installation of RLCs and discourage the Illinois General Assembly and the Illinois Department of Transportation ("IDOT") from taking actions adverse to RLCs. Plaintiff brings suit on behalf of himself and a proposed class consisting of "persons who received computer generated Violation Notices issued with video and photographic data collected by corruptly installed and corruptly maintained RLCs." *Id.* at 2-3. Plaintiff does *not* contend that any of the members of the proposed class received tickets for driving in a manner that complied with the Illinois Vehicle Code or local traffic laws.

The RICO Enterprise is allegedly "an association-in-fact of SafeSpeed executives, managers, members, stakeholders, employees, sales [consultants], and current and former public officials in the Illinois General Assembly and various municipalities." [78] at 6. Defendant SafeSpeed is an Illinois limited liability company with its principal place of business in Chicago. SafeSpeed was formed in 2007, shortly after the Illinois General Assembly passed a law permitting the use of RCLs in certain counties and making the registered owners or lessees of vehicles liable for any traffic law violations recorded by RLCs. SafeSpeed operates RLC networks. An RLC is a type of traffic enforcement camera that automatically photographs vehicles that enter an intersection while the traffic signal is red. Typically, a law enforcement officer will review the photos to determine whether a violation has occurred. If a violation is found, a citation is mailed to the owner of the vehicle. Proponents and critics of RLCs debate whether they enhance public safety or instead are used primarily as a revenue-generating tool. See *id.* at 20.

SafeSpeed was founded by Defendants Zollar, Lai, Cliff Maani, and Cliff's son, Omar Maani. Zollar is SafeSpeed's President and CEO. Defendant Helm is a SafeSpeed sales

consultant, as well as the City of Chicago Deputy Aviation Commissioner from 2014 to 2019. Defendant Doherty is a former SafeSpeed sales consultant, as well as the former Chief of Staff for Defendant Tobolski, a Cook County Commissioner and Village President of McCook, Illinois. Defendant O'Sullivan allegedly "moonli[ghted] as an undisclosed sales representative for SafeSpeed," [78] at 10, and also is the Supervisor and Democratic committeeman for Worth Township in Illinois. SafeSpeed allegedly promises its sale consultants a percentage (usually 3.5%) of the gross fines generated by RLCs they helped to place. Defendant Ragucci is the former Mayor of the City of Oakbrook Terrace, while Defendant Presta is the Mayor of Crestwood, Illinois. Defendant Sandoval is a former Illinois State Senator who served as the Chairman of the Transportation Committee and its Subcommittee on Red Light Cameras between 2009 and 2019.

The Complaint alleges that Zollar, Lai, Cliff Maani, and Omar Maani all participated in the Enterprise by (1) causing SafeSpeed to "secretly" hire public officials and "other persons perceived as politically connected or influential" as "undisclosed Sales Consultants whose compensation was calculated as a percentage of monthly income generated by the RLCs they helped corruptly to place" in Oakbrook Terrance and other Illinois municipalities under various contracts and agreements; and (2) funding, disbursing, and concealing bribes paid to Sandoval and other public officials who were "in a position to influence or approve the installation of SafeSpeed RLCs or to prevent adverse action of the Illinois General Assembly or by IDOT against SafeSpeed"; and (3) "pressur[ing] municipalities to issue the largest possible number of Violation Notices to motorists even if that compromised public safety." [78] at 7-9.

Ragucci, while Mayor of Oakbrook Terrace, allegedly accepted bribes from SafeSpeed—and Doherty in particular—to place RLCs in Oakbrook Terrace. Ragucci also allegedly "acceded to pressure" from SafeSpeed and is sales consultants "to cause his municipality to issue the largest

possible number of Violation Notices even if this required steps that decreased public safety." [78] at 9-10. Presta allegedly did the same as Mayor of Crestwood. In August 2020, he was charged with "federal crimes arising out of his acceptance of bribes to promote SafeSpeed RLCs and lying about the bribes to the FBI." *Id.* at 4.

O'Sullivan promoted SafeSpeed's RLC services to public officials in Palos Heights and Crestwood, who entered into contracts with SafeSpeed for the installation of RLCs. O'Sullivan also allegedly led "the push for more aggressive RLC ticketing in Oak Lawn." [78] at 11. Similarly, Helm allegedly "corruptly procured the placement of SafeSpeed RLCs by paying bribes to municipal officials and pressuring municipalities to issue as many Violation Notices as conceivably possible, without regard to public safety." *Id.* at 4.

Sandoval allegedly participated in the Enterprise by "using his position as Chairman of the Illinois Senate Transportation Committee and its Subcommittee on Red Light Cameras to solicit bribes from SafeSpeed and its principals in exchange for 'protection' against adverse actions in the General Assembly and by IDOT concerning applications to install RLCs in specific locations." [78] at 9. In exchange, Sandoval "requested and received annual 'campaign contributions' of $20,000 from SafeSpeed and later requested to be paid $5,000 per month, instead of a specified percentage of the monthly income from RLC fines collected from SafeSpeed RLCs." *Id.*

Sandoval resigned from the Transportation Committee and the Senate in late 2019, after it became publicly known that the FBI was investigating him for conspiracy, wire fraud, honest services fraud, and other criminal violations. In January 2020, the U.S. Attorney for the Northern District of Illinois filed a two-count indictment against Sandoval. Count I, for violation of 18 U.S.C. § 666(a)(1)(B), alleged that Sandoval "corruptly solicited, demanded, agreed to accept, and accepted things of value, namely, money, intending to be influenced and rewarded in connection

5

with a business, transaction, and series of transactions of the State of Illinois involving . . . continued support for the operation of red light cameras in the State of Illinois, including opposing legislation adverse to the interests of the red-light-camera industry." [78] at 26. The day after he was charged, Sandoval pled guilty to both charges. His plea agreement stated that:

> Beginning in or around 2016, and continuing until in or around September 2019, . . . SANDOVAL, as . . . a State Senator and Chairman of the Senate Transportation Committee, . . . corruptly solicited, demanded, agreed to accept, and accepted . . . money, intending to be influenced and rewarded in connection with . . . [his] continued support for the operation of red- light cameras in the State of Illinois, including opposing legislation adverse to the interests of the red light-camera industry, in violation of Title 18, United States Code, Section 666(a)(1)(B).

> Company A [later identified as SafeSpeed] was a Chicago-area company that provided red-light cameras that enabled municipalities to enforce certain traffic violations and issue traffic violation tickets. Company A obtained a portion of the proceeds generated from the approved- and-paid-for violations.

> The Illinois Senate Transportation Committee was responsible for considering proposed legislation concerning the regulation of red-light cameras. The Illinois Department of Transportation ("IDOT") had to approve the installation and operation of red-light cameras within the state.

> Beginning in or around 2016 and continuing until in or around 2019, SANDOVAL solicited, agreed to accept, and accepted financial and other benefits from someone who had an interest in Company A [Omar], in return for using SANDOVAL's official position as an Illinois State Senator and Chairman of the Transportation Committee to block legislation harmful to the red-light-camera industry and to advise and influence IDOT to allow Company A to install and operate red-light cameras at additional intersections. Unbeknownst to SANDOVAL, [Omar] began cooperating with law enforcement in or around 2018.

> In or around 2016, SANDOVAL asked [Omar] for $20,000 in annual campaign contributions in return for SANDOVAL's official support for Company A and its business interests. [Omar] agreed, and Company A subsequently made the contributions from Company A and other entities to conceal the fact that Company A was making the contributions to SANDOVAL.

> On or about August 16, 2017, SANDOVAL spoke by phone with [Omar]. During the call, SANDOVAL discussed splitting up Company A's annual campaign contribution to SANDOVAL into smaller amounts. [Omar] told SANDOVAL that [Omar] had provided half of Company A's annual campaign contribution, and SANDOVAL said it was not a problem for Company A's

6

President to break up the annual contribution into two contributions because [Omar] said Company A's President [Zollar] did not want the contribution to "shout out," meaning raise a red flag. SANDOVAL said, "I can see if I can … find out from anyone when the next reporting period, and we will do it right, right after that. Kind of, just kind of not make it obvious." Following publicity regarding SANDOVAL's relationship with Company A, SANDOVAL tore up the check provided by [Omar], arranged for an entity unrelated to Company A to make a $10,000 contribution to a campaign associated with SANDOVAL, and agreed to explore other ways for Company A to make its annual campaign contribution.

On or about March 19, 2018, SANDOVAL spoke by phone with [Omar]. During the call, SANDOVAL agreed to accept $10,000 in cash to be used for campaign-related expenses and agreed to block legislation harmful to the red-light-camera industry.

Specifically, [Omar] said that [Omar] had spoken with Individual A, a Company A sales agent, who said that [Omar] could provide SANDOVAL with cash to be used to pay for campaign expenses. SANDOVAL responded, "Yeah," and said he would have someone he worked with ("Co-Schemer A") coordinate with [Omar] to obtain the cash. [Omar] agreed, referred to state legislation that would ban redlight cameras, and asked for SANDOVAL to provide assurance that [Omar] should not worry about that legislation. SANDOVAL assured [Omar] that [Omar] should not worry about the legislation and said, "I'll have [Co-Schemer A] call ya." SANDOVAL subsequently arranged for Co-Schemer A to collect $10,000 in cash from [Omar] later that day.

In or around July 2018, SANDOVAL solicited $5,000 per month for using his position in the Illinois Senate to protect Company A's interests. Specifically, on or about July 31, 2018, SANDOVAL met with [Omar] at a restaurant in Burr Ridge, Illinois. During the meeting, SANDOVAL discussed receiving payment for his official support of Company A. SANDOVAL asked, "Can I bring up something personal with you?... You've been good to me, politically. But I've learned that there are people who helped [Company A] who get a monthly, um…" [Omar] interjected, "Consulting fee, sales-consulting fee." SANDOVAL continued, "When they have helped with the sighting of a camera…. On a monthly basis, [ad] infinitum." [Omar] responded, "100%. They get a percentage of the revenue that is brought in by [a] specific community." SANDOVAL said, "Like I did in Oakbrook [Terrace]." [Omar] agreed.

SANDOVAL asked, "So why don't I get that offer?" [Omar] discussed the possibility of paying SANDOVAL, who said, "It galls me to know, but because we've established such a great relationship, um, 'cause you know I'll go balls to the walls for anything you ask me…. It's hard for me to swallow how [people] make so much off of you. Right? And I gotta do the work." SANDOVAL acknowledges that he sought to receive cash payments from [Omar] in return for SANDOVAL's official acts benefiting [Omar] and Company A and made these

statements for this purpose. Later, [Omar] and SANDOVAL discussed how SANDOVAL had been a friend of the red-light- camera industry and had used his position as Chairman of the Transportation Committee to ensure that bills harmful to the red-light-camera industry were not passed.

Later during the conversation, SANDOVAL discussed being paid to act as Company A's "protector" in the Illinois Senate. When discussing the amount of the payment he would receive, Sandoval said, "I usually say, 'What's reasonable? You tell me.'" [Omar] said that [Omar] did not know how to value SANDOVAL's support for Company A, and SANDOVAL said, "I'm not trying to be dramatic, but I'm telling you the vultures would be all over that shit [redlight cameras] if you had the wrong person there." SANDOVAL said, "I think the protector aspect, it never changes. If there's a . . . bill or something like that, if you set a fee, a protector fee, unless there's something really fucking extraordinary." [Omar] asked how much SANDOVAL wanted to be paid in protection money for acting to advance Company A's interests in the Illinois Senate, and SANDOVAL asked, "But how would we do that? So how many companies do you have?... Do you have a bologna company or something innocuous?" [Omar] and SANDOVAL discussed ways to make the payment, and [Omar] asked SANDOVAL to provide the amount of the payment. SANDOVAL said, "I can't say. It would have to come from you. That's just not my style." [Omar] asked, "[J]ust off the top of your head, what pops into your head?" SANDOVAL responded, "Five," meaning $5,000. [Omar] asked, "Five a month?" SANDOVAL responded, "Yeah." [Omar] agreed to pay SANDOVAL $5,000 per month.

On or about August 29, 2018, SANDOVAL met with [Omar] at a restaurant in Burr Ridge. During the meeting, SANDOVAL accepted from [Omar] $15,000 in cash, which constituted protection money for acting to advance Company A's interests in the Illinois Senate. By September 2019, SANDOVAL had accepted a total of approximately $70,000 in protection money from [Omar].

SANDOVAL also engaged in corrupt activities with other public officials and accepted money from other people in return for using his position as an Illinois State Senator to attempt to benefit those people and their business interests. In total, SANDOVAL accepted over $250,000 in bribes as part of criminal activity that involved more than five participants. In doing so, SANDOVAL directed other criminally responsible individuals, including Co-Schemer A and Individual A.

In early February 2020, SafeSpeed issued a press release stating that it had terminated Omar Maani's ownership interest in and association with SafeSpeed. SafeSpeed also disclaimed any knowledge of Omar Maani paying bribes to Sandoval.

In February 2020, Doherty was indicted for violation of 18 U.S.C. § 1952(a)(3), in connection with his alleged payment of $4,000 in bribes to a Village of Oak Lawn Trustee in order to influence the trustee to use his position to cause SafeSpeed RLCs to be installed at additional intersections in Oak Lawn. In August 2020, Omar Maani was indicted in the Northern District of Illinois on charges of collaborating with Doherty to bribe public officials to increase the number of SafeSpeed RLCs in Oak Lawn. The same month, Presta was indicted on seven charges, including using a cellular phone to commit bribery and official misconduct, filing false tax returns, failing to file an income tax return, and making false statements to the FBI and IRS. Count IV of the indictment alleges that Presta, in his capacity as Mayor of Crestwood, requested and received $5,000 in cash from "Individual A," a representative of a Chicago-area company believed to be SafeSpeed. [78] at 36.

Plaintiff's current Complaint, as compared to his original complaint, adds allegations concerning "yellow change intervals," or YCIs—*i.e.*, the amount of time that a traffic light is yellow before it changes to red. According to the complaint, the number of violations issued by RLCs is "inversely related" to the traffic signal's YCI. [78] at 37. Zollar, Lai, and the Maanis allegedly knew or should have known that the number of Red Light Violations at an intersection could be increased by decreasing YCIs and that deceased YCIs were associated with a degradation in public safety. *Id.* at 38.

According to the Complaint, the Illinois Vehicle Code section enabling RLCs requires intersections equipped with RLCs to have a YCI that conforms to the Illinois Manual on Uniform Traffic Control Devices ("IMUTCD") published by IDOT. See [78] at 37. The minimum allowed YCI is allegedly three seconds. See *id.* at 38-39. "As such," this portion of the Complaint concludes, "the Enterprise alleged herein derives ill-gotten gains by punishing motorists for

unsafely configured YCIs and by monetizing the nuisance value of the hundred dollar Violation Notices that it endlessly and almost continuously spits out." *Id*. at 40. The Complaint reaches this conclusion without providing any allegations suggesting (1) that any of the Defendants were involved in configuring YCIs on traffic signals; (2) that the YCIs on any traffic signals have been manipulated; (3) that such manipulation had any connection to the Enterprise; (4) that Plaintiff (or anyone else) received a ticket due to an illegally short YCI—*i.e.*, one that does not conform with state law and/or IDOT regulations; or (5) that anyone paid such a ticket.

Plaintiff brings this lawsuit on behalf of a proposed class consisting of:

All persons who received a "Violation Notice" or similar communication issued by or in the name of any Illinois municipal corporation or other unit of local government, which communication alleges or asserts any traffic signal violation of the Illinois Motor Vehicle Code or similar municipal ordinance, where such Violation Notice was generated in whole or in part based on data collected by a "Red-Light Camera" ("RLC") installed or operated by SafeSpeed, LLC, that:

a) was, at the time of the alleged infraction, linked to a traffic signal with a configured yellow change interval ("YCI") duration less than three (3) seconds or

b) was, at the time of the alleged infraction, linked to a traffic signal with a configured YCI duration that was substantially reduced concurrently with or after the installation of a SafeSpeed RLC; or

c) resulted in the issuance of a Violation Notice that fails to show a yellow change interval duration at the time of the alleged infraction; or

d) that was installed:

i) after Sen. Martin Sandoval agreed to accept bribes from or for the benefit of SafeSpeed or

ii) where placement of the RLC that collected the pertinent data was procured through bribes paid to public officials, including, without limitation, Sen. Martin A. Sandoval, and

iii) where, by reason of such Violation Notice, the recipient suffered an adverse legal consequence, including, without limitation, being required to pay a fee, fine, penalty, or surcharge; to pay a court filing or other legal or administrative fee; incurring attorney fees; becoming the subject of negative credit reports for unpaid

"violations;"; having had or been threatened with having driving privileges or vehicle registration suspended; and/or having a vehicle towed, immobilized or impounded as a result of a Violation Notice.

[78] at 12-13.

The Complaint asserts two causes of action against Defendants. Count I is for violation of 18 U.S.C. § 1962(c). It alleges that the Enterprise has engaged in a "pattern of racketeering activity that damaged the Class by issuing Violation Notices on the demonstrably false pretense that they conformed to Illinois law and had been approved by public officials and IDOT out of a concern for public safety, instead of sheer greed." [78] at 41. Defendants have allegedly "conducted and participated in the affairs of the Enterprise through a pattern of racketeering activity that includes predicate acts indictable under 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 1346 (deprivation of honest services through bribes and kickbacks)." [78] at 44. The alleged "fraudulent scheme consisted of, among other things: using mail fraud to enable SafeSpeed to (a) obtain, exert, and deliberately misrepresent its corrupt control over Sandoval; and (b) suppress and conceal the level of such control and support from the Illinois General Assembly and the citizens of the State of Illinois." *Id*. at 45. Further, "[e]ach fraudulent mailing of a Violation Notices issued by an RLC procured through fraud, and public corruption" allegedly "constitutes an act of 'racketeering activity' within the meaning of 18 U.S.C. § 1961(1)." [78] at 46. The Complaint alleges that "[a]ll predicate acts committed by Defendants and the Enterprise are related and were committed with a common scheme in mind: to bilk Illinois citizens and the citizens of other States out of fines generated by RLCs placed by bribing public officials and concealing those bribes and public corruption to ensure that the RLCs could continue to generate mountains of cash." *Id*.

Count II alleges that Defendants violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). This count asserts that "[t]he nature of the above-described acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that Defendant, coconspirators, and Enterprise participants not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity." [78] at 47.

## II.    Legal Standard

Federal Rule of Civil Procedure 8(a)(2) provides that, to state a claim for relief, a complaint "must contain … a short and plain statement of the claim showing that the pleader is entitled to relief." "The questions under [this rule] are whether the defendant has fair notice of what he must defend himself against and whether there is some reason to believe he could be found liable at the end of the case." *Williams v. Dart*, 967 F.3d 625, 638 (7th Cir. 2020). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege facts which, when taken as true, "'plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level.'" *Cochran v. Illinois State Toll Highway Auth.*, 828 F.3d 597, 599 (7th Cir. 2016) (quoting *EEOC v. Concentra Health Servs.*, 496 F.3d 773, 776 (7th Cir. 2007)). For purposes of a motion to dismiss under Rule 12(b)(6), the Court "'accept[s] as true all of the well-pleaded facts in the complaint and draw[s] all reasonable inferences in favor of the plaintiff.'" *Calderon-Ramirez v. McCament*, 877 F.3d 272, 275 (7th Cir. 2018) (quoting *Kubiak v. City of Chicago*, 810 F.3d 476, 480-81 (7th Cir. 2016)). However, this "tenet … is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678, which "can [be] reject[ed] at the motion to dismiss stage." *Dix v. Edleman Financial Services, LLC*, 978 F.3d 507, 514 (7th Cir. 2020).

The Complaint in this case contains two counts for violation of RICO and is based on allegations that Defendants have engaged in a scheme to defraud Plaintiff and the proposed class. See, e.g., [78] at 43-45. The predicate acts of racketeering include, among others, mail and wire fraud. *Id*. at 44. "Where, as here, the alleged predicate acts of racketeering involve fraud, the complaint must describe the 'who, what, when, where, and how' of the fraudulent activity to meet the heightened pleading standard demanded by Rule 9(b)." *Muskegan Hotels, LLC v. Patel*, 986 F.3d 692, 698 (7th Cir. 2021); see also Fed. R. Civ. P. 9(b); *Flores v. United Airlines*, 426 F. Supp. 3d 520, 534 (N.D. Ill. 2019).

The Court reads the Complaint and assesses its plausibility as a whole. See *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011). The Court may also consider "documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *O'Brien v. Village of Lincolnshire*, 955 F.3d 616, 621 (7th 2020). In opposing a Rule 12(b)(6) motion, a plaintiff is "free to 'elaborate on his factual allegations so long as the new elaborations are consistent with the pleadings.'" *Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 753 n.2 (7th Cir. 2021) (quoting *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012)). However, "the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Agnew v. National Collegiate Athletic Ass'n*, 683 F.3d 328, 348 (7th Cir. 2012); see also *United States ex rel. Sibley v. University of Chicago Medical Center*, 486 F. Supp. 3d 1210, 1219 (N.D. Ill. 2020).

## III.    Analysis

Plaintiff brings claims for violation of RICO Sections 1962(c) and 1962(d) based on the same operative facts, and therefore his Section 1962(d) conspiracy claim is contingent on Plaintiff first successfully pleading a violation of Section 1962(c). See *Inteliquent, Inc. v. Free*

*Conferencing Corp.*, 503 F. Supp. 3d 608, 625–26 (N.D. Ill. 2020) (§ 1962(d) prohibits any person from conspiring to violate subsections (a), (b) and (c) of § 1962"); *United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 856–57 (7th Cir. 2013) ("Having failed to plead facts that would establish a violation of Section 1962(c), [plaintiff] cannot state a claim for conspiracy under Section 1962(d) based on those same facts."); *Michalowski v. Rutherford*, 82 F. Supp. 3d 775, 791 (N.D. Ill. 2015) ("Where a plaintiff fails to allege a claim under § 1962(c) … the plaintiff's § 1962(d) claim based on the same nucleus of operative facts fails as well."). Therefore, the Court begins—and ends—its analysis of Plaintiff's Complaint with the Section 1962(c) claim.

Section 1962(c) states that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Thus, to allege a violation of Section 1962(c), Plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sabrina Roppo v. Travelers Commercial Insurance Co.*, 869 F.3d 568, 588 (7th Cir. 2017) (quoting *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 778 (7th Cir. 1994)) (internal quotation marks omitted). In addition, Section 1964 "further limits the population of civil RICO plaintiffs to persons who have been 'injured in [their] business or property by reason of a violation of section 1962.'" *Sabrina Roppo*, 869 F.3d at 587 (quoting 18 U.S.C. § 1964(c)). "The phrase 'injured in business or property' has been interpreted as a standing requirement, rather than an element of the cause of action." *Vazquez v. Central States Joint Bd.*, 547 F. Supp. 2d 833, 856 (856 (N.D. Ill. 2008) (citing *Evans v. City of Chicago,* 434 F.3d 916, 924 (7th Cir. 2006), *overruled in part on other grounds by Hill v. Tangherlini*, 724 F.3d

965, 967 n.1 (2013)).  "Standing is a jurisdictional requirement that this Court must consider before reaching the merits of a RICO claim."  *Engel v. Buchan*, 778 F. Supp. 2d 846, 854 (N.D. Ill. 2011) (citing *Evans,* 434 F.3d at 924).  "The standing requirement applies to all private civil RICO claims, including … RICO conspiracy claims."  *Vazquez*, 547 F. Supp. 2d at 856.

To establish standing and secure the Court's jurisdiction over this action, Plaintiff "must allege that []he 'has been injured in h[is] business or property by the conduct constituting the violation'" of RICO.  *Sabrina Roppo*, 869 F.3d at 588 (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).  The alleged injury "must be 'concrete and actual,' as opposed to speculative and amorphous."  *Evans*, 434 F.3d at 932; see also *Vazquez*, 547 F. Supp. 2d at 860.  "[A] cause of action does not accrue under RICO until the amount of damages becomes clear and definite."  *Evans*, 434 F.3d at 932 (internal quotation marks and citation omitted); see also *Rubloff Development Group, Inc. v. SuperValu, Inc.*, 863 F. Supp. 2d 732, 744 (N.D. Ill. 2012).

Further, to satisfy RICO's standing requirement, "a plaintiff must show that the defendant's violation was both a proximate and but for cause of her injury."  *Napleton's Arlington Heights Motors, Inc. v. FCA US LLC*, 214 F. Supp. 3d 675, 690 (N.D. Ill. 2016) (citing *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006)).  "For RICO purposes, proximate cause 'requires 'some direct relation between the injury asserted and the injurious conduct alleged.'"  *In re Testosterone Replacement Therapy Products Liability Litigation Coordinated Pretrial Proceedings*, 159 F. Supp. 3d 898, 911 (N.D. Ill. 2016) (quoting *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 9 (2010)); see also *In re Sharif*, 627 B.R. 889, 895 (Bkrtcy. N.D. Ill. 2021) ("A civil RICO plaintiff has to show a direct link between its injury and the injurious conduct alleged.").  "The 'general tendency' in this context is for courts 'not to go beyond the first step,' because '[m]ultiple steps separate the alleged fraud from the asserted injury.'"  *City of Rockford*

*v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 775 (N.D. Ill. 2019) (quoting *Hemi Group*, 559 U.S. at 10, 15).

All Defendants have moved to dismiss the Complaint based on lack of standing. First, Defendants contend that Plaintiff has not alleged a concrete and actual injury to his business or property because he does not allege that he ever paid his $100 ticket. In response, Plaintiff does not challenge this assertion, but argues that it is irrelevant whether he paid the ticket because the Complaint's allegations concerning injury are sufficient. In particular, the Complaint alleges that when an "auto owner fails to pay the Violation Notice, the hundred dollar fine is doubled and secured with a claim on monies payable to the owner from the public fisc," which means "[i]n practice" that "SafeSpeed electronically transmits to the Illinois Department of Revenue computerized lists of delinquent auto owners, and the Department withholds the unpaid fees and penalties from tax refunds and other payments that would otherwise be disbursed to listed Notice recipients." [78] at 21. The Court is not wholly convinced that the possibility that Plaintiff may be owed a refund from the Illinois Department of Revenue at some unspecified time in the future, but will have the refund withheld, is sufficiently "concrete and actual" to satisfy RICO. Plaintiff may never be entitled to a refund and will lose nothing as a result of receiving his ticket. The amount of damages he has suffered has not yet, and may never, "become[] clear and definite." *Evans*, 434 F.3d at 932.[1]

Plaintiff also argues that even if his injury is not sufficient to satisfy RICO, the Complaint should not be dismissed because another plaintiff, who paid his ticket, is waiting in the wings ready

---

[1] The Court also notes that the Illinois Office of Comptroller announced in January 2020 that it would no longer assist municipalities in collection efforts for fines for RLCs, which generally was done through withholding state income tax refunds or other state payments. See Press Release, "Comptroller Mendoza Gives Red Light to Red Light-Ticket Collections" (Jan. 6., 2020), https://illinoiscomptroller.gov/news/press-releases/comptroller-mendoza-gives-red-light-to-red-light-ticket-collections/ (last visited July 31, 2021).

to take over as lead plaintiff. Although this might weigh if favor of giving Plaintiff's counsel an opportunity to file a second amended complaint, it is not a basis for denying the motion to dismiss, as it is "a basic principle that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Agnew*, 683 F.3d at 348 (quoting *Thomason v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir. 1989)); see also *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 448 (7th Cir. 2011); *Liqui-Box Corp. v. Scholle IPN Corp.*, 449 F. Supp. 3d 790, 804 (N.D. Ill. 2020).

Ultimately, the Court finds it unnecessary to resolve whether Plaintiff has adequately alleged a "concrete injury" or whether another plaintiff should be allowed to substitute in for Plaintiff, because it is apparent from the Complaint that Plaintiff lacks standing due to his failure to plead facts plausibly suggesting that his injury (to the extent he has suffered one) was proximately caused by Defendants' RICO-violative conduct.[2] Plaintiff virtually ignores this issue in his response to the motion to dismiss, arguing only that his and the proposed class members' injuries "resulted from the Enterprise's corrupt control over SafeSpeed, as an infiltrated enterprise," and "[a]s such," a handful of cases—which he cites but never discusses—"are inapposite and unavailing"—for reasons he never explains. [110] at 17. The Court agrees with Defendants that the direct cause of Plaintiff and the proposed class members' injuries was not Defendants' alleged RICO violations, but rather their failure to follow the Illinois Vehicle Code—in Plaintiff's case, by making a rolling right-hand turn while his traffic signal was red. While Plaintiff believes such turns are harmless, he never suggests (either in the Complaint or response to the motion to dismiss) that he did not make a rolling right-hand turn or that rolling right-hand

---

[2] There is also a factual dispute concerning whether Plaintiff is the owner of the 2008 Taurus. Although the Complaint alleges that he is, see [78] at 17, ¶ 54, the City introduces evidence that the car is owned by Plaintiff's wife. See [86] at 9-10. The Court finds it unnecessary to resolve this issue, as Plaintiff lacks standing regardless.

turns are allowed under the Illinois Vehicle Code.[3]  They are not.  625 ILCS 5/11-306(c) requires a driver approaching an intersection with a steady red traffic light, and no sign prohibiting right-hand turns on red, to come to a complete stop and yield to any approaching vehicles or pedestrians before making a right-hand turn.

The Complaint obliquely suggests that part of Defendants' RICO scheme involved equipping traffic signals with YCIs that were too short to comply with the IMUTCD or, in turn, the Illinois Vehicle Code.  See [78] at 37-40.  But the Complaint is devoid of any factual allegations that would support such a conclusion.  The Complaint summarizes the IMUTCD's requirements concerning YCIs, asserts that they require a YCI to be at least three seconds long, and then, in a total *non sequitur*, concludes that "the Enterprise alleged herein derives ill-gotten gains by punishing motorists for unsafely configured YCIs and by monetizing the nuisance value of the hundred dollar Violation Notices that it endlessly and almost continuously spits out."  *Id*. at 40. The Court will not give this conclusion a presumption of truth because, as pointed out above, the Complaint contains no factual allegations plausibly suggesting (1) that any of the Defendants were involved in configuring YCIs on traffic signals; (2) that the YCIs on any traffic signals have been manipulated (3) that such manipulation had any connection to the Enterprise; (4) that Plaintiff (or anyone else) received a ticket due to an illegally short YCI; or (5) that anyone paid such a ticket. Further, Plaintiff never mentions YCIs at all in his response to the motions to dismiss, [110] at 3, leading the Court to conclude that this potential avenue to establish standing is a dead end.

---

[3] Plaintiff distinguishes his infraction from "reckless drivers who cause serious harm by disregarding traffic signals to enter intersections at a high rate of speed."  [110] at 16.  However, his proposed class does not distinguish between the two types of conduct.  And if his suit were to succeed, it would reward both "dangerous" and "non-dangerous" violators with treble damages due solely to the fact that the RLCs that caught their behavior were allegedly installed as a result of Defendants' corruption.

With the unsupported conclusions concerning YCIs set to the side, the Complaint does not allege any viable theory under which Plaintiff or any member of the proposed class received a ticket for committing a traffic violation that they did not, in fact, commit. Plaintiff and the other members of the proposed class could have avoided any injury by simply complying with the traffic laws. Thus, their own conduct was the direct cause of any injuries they suffered. See, e.g., *In re MasterCard Int'l Inc., Internet Gambling Litigation*, 132 F. Supp. 2d 468, 496 (E.D. La. 2001) (even if alleged activities of defendant credit card companies and issuing banks in facilitating internet gambling by providing a means to obtain virtual cash to use at internet casinos were illegal, gamblers could not pursue civil remedies under RICO due to their inability to plead proximate causation since, "'[u]nlike an ordinary RICO victim, in this case the allegedly injured plaintiffs, *i.e*., the players, can avoid any injury simply by walking away from the alleged wrongdoers, the casinos, by not playing . . . in the casinos'" (quoting *Doug Grant, Inc. v. Greate Bay Casino Corp.,* 232 F.3d 173, 187–88 (3rd Cir.2000))), *aff'd*, *In re MasterCard Int'l Inc*., 313 F.3d 257, 264 (5th Cir. 2002) ("we reiterate the district court's statement that 'RICO, no matter how liberally construed, is not intended to provide a remedy to this class of plaintiff'" (quoting *In re Mastercard*, 132 F. Supp. 2d at 497)); see also *Green v. Aztar Corp*., 2003 WL 22012205, at *3 (N.D. Ill. Aug. 22, 2003); *Cadle Company v. Flanagan*, 2005 WL 8167447, at *4 (D. Conn. Feb. 11, 2005); *Adell v. Macon County Greyhound Park, Inc*., 785 F. Supp. 2d 1226, 1244 (M.D. Ala. Mar. 31, 2011).

The Court also finds instructive *Ove v. Gwinn*, 264 F.3d 817 (9th Cir. 2001), in which the Ninth Circuit considered, and rejected, a RICO claim involving facts comparable to those alleged by Plaintiff here. In *Ove*, the plaintiffs were motorists who were arrested and charged with driving under the influence ("DUI"). *Id.* at 820. After their arrests, plaintiffs had blood samples taken by employees of a private company that had contracted with law enforcement authorities to provide

that service.  However, those employees were not licensed as required by the California Vehicle Code.  *Id.* at 820-21.  Plaintiffs sued county officials, the private company, and its employees for RICO violations, alleging that the defendants engaged in a pattern of racketeering activity by committing mail and wire fraud and extortion.  "Plaintiffs assert[ed] that the extortion occurred when individuals, unlicensed under Cal. Veh. Code § 23158, drew blood thereby increasing fines paid to San Diego City and County, and that the mail and wire fraud occurred when the bills and blood results were mailed without disclosing that the blood was taken by unlicensed employees." *Ove*, 264 F.3d at 825.  The Ninth Circuit affirmed the district court's dismissal of the RICO claim, concluding that plaintiffs "fail[ed] to satisfy the RICO causation element because they do not demonstrate that the conduct directly *and* proximately caused the alleged injury." *Id*.  The court explained that, "[e]ven if we were to assume that the plaintiffs would not have pleaded guilty without the blood test results, their complaint would still fail to establish the requisite causation because they do not allege that the use of individuals, unlicensed under Cal. Veh. Code § 23158 to draw blood, caused their blood alcohol level to register above the legal limit." *Id*.  Likewise, in this case, Defendants' alleged RICO scheme did not cause Plaintiff (or any other proposed class members) to roll through red lights or engage in other behavior that violates Illinois traffic laws.

The Seventh Circuit's opinion in *Evans,* 434 F.3d 916, is illuminating as well.  In that case, plaintiff had gone on television accusing CPD officers of killing his cousin while taking her into custody.   *Evans v. City of Chicago*, 2003 WL 22232963, at *1 (N.D. Ill. Sept. 26, 2003).  Afterwards, CPD allegedly retaliated against plaintiff by repeatedly stopping, harassing, and arresting him.  See *id*. at *1-3.  As a result, plaintiff was incarcerated and spend thousands of dollars hiring an attorney to defend him against three criminal charges.  See *id.* at *3-4.  Ultimately, he was convicted of one charge and the other two charges were dropped.  See *id.* at *3.  Plaintiff

brought suit against the officers for, among other things, violating RICO § 1962(c). *Id.* at *6. His alleged RICO injury was the attorneys' fees he incurred for his criminal defense. *Id.* at *7. Plaintiff acknowledged that the attorneys' fees spent on the charge for which he was convicted did not constitute a RICO "business injury," but argued that the fees incurred defending the two dropped charges should be considered a "business injury." *Id.* The district court held that the defendant's RICO violations were not the proximate cause of that alleged injury, *id.*, and the Seventh Circuit affirmed. The court of appeals reasoned that plaintiff could not show that "an illegal act enumerated in 18 U.S.C. § 1962 … was the proximate cause of his alleged injuries," because there was "no indication in the record whatsoever that [plaintiff] was mistakenly or incorrectly arrested or charged with the offenses that were later abandoned." *Evans*, 434 F.3d at 933 n.27. One of the charges, for possession of a controlled substance, "was abandoned as part of a pre-arranged plea agreement." *Id.* As to the other abandoned charge, for violation of probation, "there [wa]s nothing to suggest that [plaintiff] had not violated his parole and was correctly charged with this offense." *Id.* The Seventh Circuit reached the conclusion that proximate cause was lacking even though, from Plaintiff's perspective, the defendant officers targeted him and arrested him for these offenses as part of a pattern of racketeering meant to harass and intimidate him for speaking out about his cousin's death.

Similarly, in this case, even though Plaintiff believes that he would never have been ticketed for making a rolling right-hand turn but for SafeSpeed's "corruptly installed" RLC, there is no suggestion in the pleadings that Plaintiff had not committed the traffic violation for which he was ticketed. Further, Plaintiff's alleged "injury" is more remote than the ones in *Ove* and *Evans*. The only bribes with an apparent connection to Plaintiff's injury are the ones that Ragucci alleged received in 2017 from unspecified persons associated with SafeSpeed to encourage him to contract

with SafeSpeed to deploy RTCs in Oakbrook Terrace. See [78] at 3, 9. However, Plaintiff's theory that these bribes—rather than his own actions—"caused" his injury presumes that if Oakbrook Terrace had not contracted with SafeSpeed, the City (1) would not have contracted with another RLC operator—which seems implausible given the alleged "land rush by would-be RLC providers into municipalities southwest of Chicago" following passage of the state law authorizing use of RLCs, *id.* at 22, and (2) would not have any police officers enforcing the law requiring drivers to come to a full stop before making a right-hand turn on red. Further, the complaint alleges that before a ticket is issued, "a law enforcement official will review the photographic evidence [collected by RLCs] and determine whether a violation occurred," *id*. at 20, which adds another step to the causal chain.

The Complaint's allegations concerning Sandoval have an even more tenuous connection to Plaintiff's injury or the injury of any other members of the proposed class. Sandoval was allegedly paid bribes to help stop proposed legislation in the Illinois General Assembly that would have limited the use of RTCs. Plaintiff's theory of causation assumes that Sandoval actually had the power to stop the bills from leaving his committee; that he exercised that power; that the bills would have passed out of committee, and also would have passed the full House and become law, but for Sandoval's actions; and that the bills would have eliminated the RTCs that allegedly caused Plaintiff's and the proposed class members' injuries. Compare *Empress Casino Joliet Corp. v. Johnston*, 763 F.3d 723, 731-34 (7th Cir. 2014) (RICO action brought by owners and operators of riverboat gambling casinos against former Governor Blagojevich and members of horse racing industry alleging defendants conspired to exchange campaign contributions for ensuring two bills were enacted imposing tax on casinos; plaintiffs failed to demonstrate proximate cause as to one bill due to lack of evidence governor influenced its passage, but were entitled to trial concerning

22

second bill, where evidence was that he agreed to sign the bill in exchange for $100,000); *James Cape & Sons Co. v. PCC Const. Co*., 453 F.3d 396 (7th Cir. 2006) (affirming grant of judgment on the pleadings for defendants on RICO claim based on lack of proximate cause; finding that damages to construction company due to competitors' conspiracy to rig bids for state construction contracts were not proximately caused by competitors' violations of RICO, where "it is entirely possible that Defendants would have won some bids absent the bid-rigging scheme, even if making less profits in the meantime" and "[a] court could never be certain whether [plaintiff] would have won any of the contracts that were the subject of the conspiracy 'for any number of reasons unconnected to the asserted pattern of fraud'" (quoting *Anza*, 547 U.S. at 458)). In short, Plaintiff's theory about how Defendants' RICO violations injured him and other members of the proposed class goes far "beyond the first step" of causation, in a manner not contemplated by RICO jurisprudence. *City of Rockford*, 360 F. Supp. 3d at 775.

*Ove*, *Evans*, and the Complaint here stand in stark contrast to cases like *Wood v. Incorporated Village of Patchogue of New York*, 311 F. Supp. 2d 344 (E.D.N.Y. 2004), and *Clark v. Conahan*, 737 F. Supp. 2d 239 (M.D. Pa. 2010), in which the alleged RICO conspiracy led directly to the plaintiff being required to pay fines for which there was no valid legal basis. See *Wood*, 311 F. Supp. 2d at 348, 359 (mail fraud was sufficiently alleged, as predicate act in RICO suit claiming that village mayor and chief constables operated village court as RICO enterprise through which motorists were illegally ticketed and fined by a private police force that had no police authority, through allegations by one claimant that he received mailed written notices directing him to appear in village court regarding traffic citation); *Clark*, 737 F. Supp. 2d at 250, 267-68 (parents of juvenile, who allegedly paid fines as result of juvenile's wrongful delinquency adjudication, incarceration, and probation, which allegedly resulted from scheme by juvenile court

judges, juvenile probation staff, property owners, and others to divert juvenile offenders to newly constructed privately-owned juvenile detention facilities in return for kickbacks, had standing to bring civil RICO claims, where plaintiffs alleged economic injury from paying the fines proximately related to predicate acts of honest services fraud; the judge who accepted son's plea and sentenced him to six months detention "falsely stated that [the son] was charged with being intoxicated and possession of marijuana" when in fact he had been charged only with violation of town curfew and possession of drug paraphernalia). Unlike the plaintiffs in those cases, Plaintiff's injuries "were not caused directly by the alleged fraud, and thus were not caused 'by reason of' it.'" *Hemi Group*, 559 U.S. at 18. Plaintiff, "therefore, has no RICO claim." *Id*. Given Plaintiff's lack of standing and, in turn, the Court's lack of jurisdiction, *Engel*, 778 F. Supp. 2d at 854, the Court finds it unnecessary to consider the sufficiency of the Complaint's allegations concerning the existence of, and Defendants' participation in, a RICO Enterprise.

## IV.    Conclusion

For these reasons, the City of Oakbrook Terrace's motion to dismiss [86] is denied as moot; and Ragucci's motions to dismiss [79] and [87], Lai, SafeSpeed, and Zollar's motion to dismiss [83], Khalid's motion to dismiss [88], and O'Sullivan's motion to dismiss [90] are granted. The Complaint is dismissed for lack of standing. Given that (1) Plaintiff already has had an opportunity to amend his complaint and (2) the standing obstacle appears to be insurmountable through an amended pleading, especially in view of the extensive briefing on the motions to dismiss, the Court will not prolong this litigation any further in the district court. A final judgment will be entered consistent with Federal Rule of Civil Procedure 58. Civil case terminated.

Dated: August 4, 2021

_____

Robert M. Dow, Jr.
United States District Judge